THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC J. ROBLES, Defendant-Appellant.

Second District  No. 2—95—0527

Opinion filed June 20, 1997.

THOMAS, J., dissenting.

Kathleen L. Roach, Susan A. Weber, Eric H. Sussman, Neil H. Wyland, and Margaret L. Fitzpatrick, all of Sidley & Austin, of Chicago, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (John X. Breslin and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:

On April 30, 1993, defendant, Eric Robles, was indicted on 10 counts of first degree murder (720 ILCS 5/9—1(a)(1) (West 1992)) and 2 counts of solicitation of murder for hire (720 ILCS 5/8—1.2 (West 1992)) for the stabbing deaths of his parents, Peter and Diana Robles. It was alleged that defendant had paid a high school classmate, Sean Helgesen (Helgesen), to help him kill his parents. Following a jury trial, defendant was found guilty but mentally ill (GBMI) on all counts. The duplicative murder convictions were vacated, and, on April 5, 1995, defendant was sentenced to a mandatory term of natural life for the two counts of murder and to concurrent sentences of 35 years' incarceration for the solicitation of murder for hire convictions. The trial court subsequently denied defendant's motion for a new trial, and this timely appeal followed.

On appeal, defendant raises four issues, namely: (1) whether the Illinois GBMI statute (725 ILCS 5/115—4(j) (West 1992)) violates state and federal guarantees of due process; (2) whether the trial court's refusal to answer the jury's questions about the definitions of mental illness violated defendant's due process right to a fair trial; (3) whether the Illinois GBMI statute violates state and federal guarantees of equal protection; and (4) whether the trial court committed reversible error by allowing certain expert testimony offered by the State, while denying defendant the chance to put on evidence to rebut a report relied upon by the State's experts. Because of our determination of the first issue, we do not need to address defendant's final three arguments.

■ Initially, we will address a motion filed by the State to strike portions of the statement of facts found in defendant's brief. Specifically, the State maintains that the opening and closing sentences of the statement of facts are argumentative and not based on the record, respectively. In response, defendant essentially maintains that the disputed sentences contain no improprieties. After reviewing the subject sentences, we find the State has properly characterized them. Accordingly, both sentences will be stricken from defendant's statement of facts.

Defendant made a pretrial motion to suppress his statements to the police and an assistant State's Attorney. This motion was denied on October 7, 1994. The jury trial began on December 5, 1994. In its opening statement, the defense introduced the insanity defense.

## State's Case

Elgin Detectives Daniel Rodmer and Michael Gough testified that, after 11 p.m. on the evening of April 17, 1993, they came upon defendant and Sean Helgesen near Elgin High School. The detectives were investigating a parked car at Elgin High School and noted that the license plate was covered by duct tape. Defendant was naked from the waist down. Both defendant and Helgesen had substantial amounts of blood on their persons, and defendant had an injury to his right leg. The detectives retrieved a blood-covered folding knife from defendant's person. En route to Sherman Hospital, defendant was asked who should be notified of his injury. Defendant replied, "I just killed my mom." Helgesen, who was not injured, was transported to the Elgin police department.

Sergeant Robert Page of the Bartlett police department testified that at 11:20 p.m. on April 17, 1993, he went to defendant's home. Sergeant Page found a woman, later identified as defendant's mother, Diana Robles, on the front room floor. He then found the body of a man, later identified as defendant's father, Peter Robles, in the downstairs bathroom. Both victims had been cut and stabbed numerous times in their necks and chests. Sergeant Page testified that Diana was still alive when he found her. Evidence showed that she subsequently died in the hospital.

Paul Weiland testified that he was defendant's cousin. According to Weiland, on April 14, 1993, defendant requested a gun from him. Weiland took a .22-caliber handgun and three bullets from a locked closet in his parents' bedroom and gave these to defendant the following day. Weiland's father, Gary, subsequently identified this handgun as a .22-caliber derringer that he had kept in a locked closet at his home.

Chris Washburn testified that he spoke several times with defendant on April 15, 1993. Defendant demanded that Washburn get $100 within four hours and threatened him with "trouble." Washburn stated that he obtained the money from a friend and met defendant later that day. During this meeting, which took place in defendant's car, defendant held a gun to Washburn's head, took the money, and told Washburn not to tell anyone.

Shane Jones testified that he saw Helgesen and defendant on April 17 in Helgesen's home. They drove to another friend's house, with defendant driving in a separate car. According to Jones, on April 18, police officers and an assistant State's Attorney searched his car and found two gloves, a black dress shirt, a pair of black jeans, black socks and black shoes, none of which belonged to Jones.

Helgesen's girlfriend, Melissa Mazur, testified that she went out

with him on April 16, the day before the murders. When defendant was paying for some food, Mazur saw him pull out a "wad" of $20 bills, which, according to her, was unusual. Later that day, she was in Helgesen's bedroom and saw a gun and a knife in the dresser drawer.

Donald Cicikakus, the father of one of defendant's friends, testified that he called defendant at approximately 10:30 p.m. on the evening of the murders. Defendant told Cicikakus that his parents were dead. Cicikakus asked him whether he had had a fight with his father. Defendant answered that he had "it planned" and that they used a knife, not a gun.

Joseph Birkett, then chief of the criminal division of the Du Page County State's Attorney's office, testified that, on April 18, 1993, he went with the police to defendant's hospital room. They introduced themselves and advised defendant of his rights. Defendant signed a rights form and agreed to speak to them. He could not recall how the stab wound to his leg occurred. When asked about the murders, defendant said, "[A]ll I did was pay [Helgesen] to do this." A tape-recorded statement made by defendant during this interview was played for the jury.

Early in the morning of April 18, police returned to the murder scene. They followed a trail of blood from the house to the intersection of Heather and Morning Glory Lanes, a distance of between an eighth of a mile and quarter of a mile in length.

Postmortem examinations of Peter and Diana Robles conducted by Dr. Shaker Teas revealed the following. Diana had a large deep slash wound to her neck, which severed the carotid artery. Another slash wound went from her right ear to her mouth. She had sustained 11 additional wounds to the head and face, some applied with enough force to penetrate the skull. She had been stabbed in her chest at least four times, with one wound going into her left lung and heart. Diana's arms had a number of wounds, which were consistent with attempts to defend herself. Dr. Teas opined that these stab wounds and slashes could have been inflicted by the knife that police took from defendant on the night of April 17.

Dr. Teas further testified that Peter had been slashed or stabbed nine times in his head and neck. His carotid artery and jugular vein had been "nicked" and several of the stab wounds went through the scalp. He received two trunk wounds, both of which entered a lung and one of which broke his clavicle. Peter's arms and hands had sustained a number of wounds consistent with attempts to protect himself. The knife wounds could have been caused by the subject knife, according to Dr. Teas.

Several witnesses described incidents occurring in the months prior to the subject murders in which defendant had lost his temper with his mother, accusing her of favoring his brother, Jason. There was also testimony regarding an occurrence in which defendant had threatened a school official.

## Defendant's Case

Lois Budzyn testified that she was a neighbor of defendant's family for a number of years. She baby-sat for defendant and his brother, Jason, on occasion. She recalled over 10 incidents in which Peter Robles had come home and shouted at and hit his sons, causing them to cry. She did not recall seeing any physical signs of injuries to defendant and Jason.

Cheryl Watkins, a learning disabilities resource teacher, stated that she had taught defendant from 1988 to 1990. According to Watkins, defendant had a low to average intelligence quotient and exhibited no emotional disturbances. Defendant showed deficits in long- and short-term memory, in sequencing, and in visual motor skills. Watkins, who also taught Jason, recalled that Peter was helpful in educational matters related to Jason but was angry when called about defendant. She did not see any signs of physical abuse on either boy.

Brian Haske testified that he met defendant when both played on the freshman football team at Elgin High School. Haske had been in a car accident in which another friend of defendant's, Diane Wagner, had been killed. After the accident, defendant assumed the role of a "father figure" to Haske, until the latter felt a need for more freedom. Haske stated that he had been to Robles' home many times and never saw the father being physically or mentally abusive. He described the father as a man of differing personalities, sometimes nice, and other times temperamental and quick to anger. Haske stated that, in the week prior to the murders, defendant seemed very quiet and did not associate with his old friends. On April 17, while driving to a party, Haske saw defendant in another car. Haske thought that defendant looked confused but not intoxicated.

Janell St. Louis stated that she had known defendant since the fourth grade. He was like a brother to her. According to St. Louis, defendant loved his mother and was protective of her. Late in 1992, defendant told her that his parents were going to get a divorce and that he was tired of their arguing. Defendant did not tell her that his father was abusive to family members.

Kristin, whose last name is not found in the record, testified that she dated defendant intermittently from August 1991 to January

1993. During this time, Kristin became pregnant and underwent an abortion, against defendant's wishes. Subsequently, their relationship gradually deteriorated and Kristin sought to avoid all contact with defendant. Kristin stated that she never saw defendant's father abuse him. According to Kristin, defendant quit the Elgin High School football team because he did not like it anymore. Further, she said that defendant was not close to his grandfather, who died in 1992. Late on April 16, 1993, defendant called Kristin, asking repeatedly to see her. After she hung up, defendant called again, seeking to meet her outside her home.

Another girlfriend of defendant's, Jennifer Engel, testified that she began dating him in January 1993. Despite an incident in February or March 1993, in which defendant had become intoxicated, they continued seeing each other. Around Easter, they had arranged to go to a movie. Defendant told Engel that his mother was crying and that his father had gone off to a bar. Rather than go to the movie, defendant wanted to look for his father. Defendant carried a baseball bat in the car. They drove to one bar and then drove back to defendant's home, where they saw that his father's car was parked outside. Defendant went inside the house and then came out, telling Engel that the date was cancelled.

Engel further testified that on April 16, 1993, she went with defendant to watch a videotape at his home. When they entered the house, defendant's father called him upstairs. Defendant appeared startled. When defendant returned, he looked troubled; they decided to go to Engel's home. On April 17, she saw defendant during the day and talked to him on the telephone at about 10 p.m. During this phone call, defendant said that he was with Helgesen, and they were going over to Sean's house to shower and get some clothes. In Engel's view, he sounded normal.

According to Engel, defendant's relationship with his mother was "pretty good." She stated that defendant had told her that his father was an alcoholic; that his father had beaten his mother; and that he hated his father. Engel stated that she had never seen the father abuse anyone.

Tim Riordan stated that he had been a friend of defendant's since the third grade. Riordan played with defendant on the football team, where defendant had assumed a leadership role. Riordan stated that, on several occasions, he had seen incidents in which defendant's father had yelled at him. Defendant told Riordan that he hated his father's drinking and his parents' fighting. Late in 1992, defendant asked Riordan if he could stay at the latter's home to get away from the fighting. Riordan testified that defendant drank throughout high

school but cut back while he was dating Kristin. Riordan quit the football team along with defendant and Brian Haske after their sophomore year. Riordan stated that defendant was bored with football and did not want to play. In March and April 1993, Riordan noted that defendant kept to himself and that his hair grew long and his style of dress changed. Riordan conceded that he had once described defendant as a "thick-headed stubborn individual" and had said that defendant lied.

Ted Praznowski, who lived next door to the Robleses for 16 years, stated that he was aware of Peter's drinking. When defendant was about eight, Praznowski saw the father yell at defendant and kick him "in the butt." He did not see other instances of physical abuse but did hear yelling on several occasions. Praznowski also stated that he heard the parents arguing on many occasions.

Lorraine Chiodo, the mother of Diana Robles, stated that, early in 1993, her daughter arrived at her house, looking upset, and stayed there for three days. This had occurred several times during the Robles marriage. According to Chiodo, when Peter drank alcohol, he became withdrawn. Chiodo stated that she had never seen Peter abuse his wife or his children.

Defendant's brother, Jason, testified that his father drank 10 or more beers on a daily basis. His father's drinking caused many arguments between his parents. On occasion, the parents would push or hit each other. According to Jason, defendant, who was very close to their mother, took his mother's side, at times getting into a physical altercation with his father. Jason stated that, when he and defendant were young, their father regularly spanked them with a paddle. As they grew older, their father switched to "mind games," *i.e.*, playing up to one son and turning on the other. During one four- to five-month stretch, their father discontinued drinking, and the family fighting stopped.

Jason testified that in November 1992 he began working with his father, whose drinking was again causing problems between the parents. After the death of his grandfather in August 1992 and the accident in which Diane Wagner was killed and Brian Haske injured, defendant seemed to change. He began drinking more, and he became sloppy in appearance. He quit the football team, and his attendance at school slipped. According to Jason, defendant became temperamental and quick to anger.

Jason stated that early in April his parents had a fight, during which his mother took off her wedding rings, threw them at her husband, and left the house. She stayed away for several days and, upon returning, was cold and quiet toward her husband. Defendant

was upset by this situation and remained angry after his mother's return.

Jason stated that his father had been upset by defendant's police problems, appearance, and poor school attendance. Defendant would talk back to his father, sometimes using foul language. According to Jason, defendant did not use such language towards their mother. He recalled an incident in February 1992 in which defendant had to be "pulled off" their father, who did not hit back at defendant.

Jason stated that he did not believe that defendant had killed their parents. Further, he testified that defendant did not sound like himself on the statement tape-recorded by the police.

Dr. Ruth Kuncel, a clinical psychologist, interviewed defendant at the behest of his attorney. Dr. Kuncel met with defendant on two occasions for a total of five hours. She also interviewed Jason Robles and reviewed relevant documents, including the reports of Drs. Daniel Hardy and Henry Lahmeyer, as well as the report of psychological testing performed by Dr. Hartman.

Dr. Kuncel opined that defendant had a significant personality disorder and substantial deficits in his cognitive functioning. According to Dr. Kuncel, defendant's ability to think abstractly is limited, and he has difficulty with judgment and cannot assess alternatives or understand the consequences of actions. She viewed the father's drinking as having a profound impact on defendant, whose self-esteem and ability to develop relationships suffered. As a result of his father's drinking behavior, defendant became intensely close to his mother, whom he felt a responsibility to protect.

In Dr. Kuncel's perspective, the 15 months prior to the murders were very difficult for defendant. The father's drinking began to cause more arguments between the parents. Moreover, his grandfather died, and defendant quit the football team. Dr. Kuncel described defendant's reaction to his girlfriend's abortion as one in which, as a Catholic, he became "enormously upset." The girlfriend's father, who had once had a good relationship with defendant, threatened to have defendant killed. Dr. Kuncel opined that this threat placed the concept of murder for hire into defendant's thinking. Then, in November 1992, a serious automobile accident killed one friend and seriously injured another. According to Dr. Kuncel, defendant, who had been depressed for years, became more seriously depressed at this time. His attendance at school decreased, while his drinking increased.

Dr. Kuncel noted that two weeks before the murders defendant's parents had a "really big fight," in which the mother threw her wedding rings and went to her mother's house for several days. Dr. Kun-

cel explained that defendant felt compelled to deal with this problem but that his thinking had become delusional. In her opinion, at this time defendant was psychotic. She further opined that defendant was legally insane at the time of the murders, as he was not capable of conforming his conduct to the law's requirements.

On cross-examination, Dr. Kuncel conceded that she had written a report dated March 8, 1994, wherein she expressed a different opinion from the one she had given during direct examination. She explained that her opinion had changed due to additional information she received. She further testified that she had studied Dr. Hartman's report on his psychological testing of defendant and that the results were similar to those of tests that she had administered to defendant.

The State presented a number of witnesses in rebuttal. Prominent among those were two psychiatrists, Drs. Henry Lahmeyer and Daniel Hardy, who had been retained by the State to assess defendant.

Dr. Lahmeyer testified that he reviewed the relevant documents and interviewed defendant on July 14, 1994. Dr. Lahmeyer noted that the juvenile and family counseling reports indicated no abuse of the children, marital discord, or alcohol abuse. He also reviewed the psychological testing performed by Dr. David Hartman, a psychologist. Dr. Lahmeyer agreed with the results of the testing, which indicated that defendant was suffering from "anti-social traits and overt anti-social personality," while exhibiting self-serving, self-centered, and paranoid traits.

Dr. Lahmeyer stated that, during his interview with defendant, the latter appeared easy going and well groomed. Defendant told him that he would not plead insanity because he "wasn't crazy at the time." Further, defendant stated that he would plead not guilty because he did not commit the crimes.

Dr. Lahmeyer stated that he agreed with most of Dr. Kuncel's testimony but disagreed with her conclusion. In his opinion, nothing in her report indicated that defendant was psychotic. He noted that the results of her psychological testing were the same as those reached in the psychological tests administered by Dr. Hartman. Dr. Lahmeyer concluded that there was absolutely no evidence of insanity in defendant.

Dr. Daniel Hardy testified that he had reviewed the various records and reports that had a bearing on the case. He opined that the hiring of another person to commit murder involves a significant degree of planning and goal-directed behavior. Defendant's attempts to conceal the crime, including the covering of the license plate with

duct tape and wearing gloves, also demonstrated a recognition that the conduct was wrong. Dr. Hardy did not find any evidence of a disordered thought process in defendant's tape-recorded statement.

Dr. Hardy testified that he interviewed defendant on June 7, 1994. They discussed the facts of the case, as well as defendant's upbringing. At one point in the interview, defendant stated, "I never intended for my Mom. I always intended for my Dad." Dr. Hardy concluded that there was no clinical or other evidence of defendant having a psychosis.

At the close of the State's rebuttal, defendant attempted to call Dr. Michael Rabin to testify to alleged defects in Dr. Hartman's report, which, in Dr. Rabin's view, made it unreliable. The State moved to bar Dr. Rabin's testimony. The trial court granted the State's motion, finding that it was impermissible for the defense to impeach Dr. Hartman, a nontestifying witness. After an offer of proof, in which Dr. Rabin was examined intensively, the trial court reconfirmed its granting of the State's motion to bar the disputed testimony.

During the jury instruction conference, the State requested that, in addition to the "guilty," "not guilty," and "not guilty by reason of insanity" verdicts, the jury also be instructed on the "guilty but mentally ill" verdict. The defense objected to any jury instruction that made reference to the GBMI statutory definitions or verdict. Despite agreeing that the GBMI statutory scheme was "constitutionally bad," the trial court ruled that it would instruct the jury regarding said GBMI statutory scheme.

As to each count, the jury was instructed:

"[A] special verdict of guilty but mentally ill may be returned by you instead of a general verdict of guilty if you find each of the following circumstances to be present in this case:

First: That the State has proved [beyond] a reasonable doubt that the defendant is guilty of [the charge]; and

Second: That the defendant has not proved by a preponderance of the evidence that he was insane at the time he committed the offense of [the charge]; and

Third: That the defendant has proved by a preponderance of the evidence that he was mentally ill at the time he committed the offense of [the charge].

If you find from your consideration of all the evidence that each one of these circumstances is present, you may return the special verdict finding the defendant guilty but mentally ill of [the charge].

If you find from your consideration of all the evidence that the State has proved beyond a reasonable doubt that the defendant is

guilty of [the charge] and if you find that either the second or third circumstance concerning the guilty but mentally ill verdict is not present, you should return the general verdict finding the defendant guilty of [the charge]."

After the jury began its deliberations, it sent out two notes to the trial court. The first query read, "We are hung up on the definition of mental illness, is there any other information we can use?" The trial court indicated to the parties' attorneys that "[t]he answer to [the] question is contained in the Court's Instructions [sic]. There is no other information the Court can supply." Over the defense's objection, the trial court directed the jury to review the original instructions.

A number of hours later, the jury sent a second question to the trial court, namely, "Your Honor—A juror needs to know if this instruction on the definition of 'mental illness' [sic] was mistyped. Thank you." To which the trial court replied, "The instruction has been typed properly." Within a half hour, the jury returned with verdicts of GBMI on all counts against defendant.

We first address the issue of whether the GBMI statute violates the defendant's constitutionally guaranteed right of due process. Before setting out the parties' arguments on this issue, we will include the pertinent statutes and will provide a brief background of the GBMI statute.

## Relevant Statutes

Regarding the determination of this issue, the following statutes are of primary importance. Section 6—2 of the Criminal Code of 1961 reads in relevant part:

"(a) *A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.*

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from *a mental illness*, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.

(d) *For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law.*

(e) *When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity.* However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of each of the offenses charged, and, in a jury trial where the insanity defense has been presented, the jury must be instructed that it may not consider whether the defendant has met his burden of proving that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense with which he is charged." (Emphasis added.) 720 ILCS 5/6—2 (West 1992).

Section 115—4(j) of the Code of Criminal Procedure of 1963 reads in relevant part:

"When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned instead of a general verdict, but that such special verdict requires a unanimous finding by the jury that: (1) the State has proven beyond a reasonable doubt that the defendant is guilty of the offense charged; and (2) the defendant has failed to prove his insanity as required in subsection (b) of Section 3—2 of the Criminal Code of 1961, as amended, and subsections (a), (b) and (e) of Section 6—2 of the Criminal Code of 1961, as amended; and (3) *the defendant has proven by a preponderance of the evidence that he was mentally ill, as defined in subsections (c) and (d) of Section 6—2 of the Criminal Code of 1961, as amended, at the time of the offense.*" (Emphasis added.) 725 ILCS 5/115—4(j) (West 1992).

## Background of the GBMI Statute

At this point, it is useful to review the background of the GBMI statute. Our principal source for this information is the Report of the Governor's Commission to Revise the Mental Health Code of Illinois. In the 1980s, then Governor Thompson created the Governor's Commission to Revise the Mental Health Code of Illinois (Commission). This Commission was comprised of many of the State's leading authorities on psychiatric matters, including forensic psychiatry. The Commission made numerous recommendations to improve the care and treatment of Illinois' mentally ill population.

In its report, the Commission described the origins of the GBMI statute thusly:

"The Illinois GBMI provisions were patterned after a law

enacted in Michigan in 1975. The Michigan law was a response to a decision of the Michigan Supreme Court requiring that persons confined as insanity acquitees be treated just like persons who were civilly committed. [Citation.] The Michigan legislature feared that this decision would result in the release of dangerous mentally ill criminals. [Citation.]

Even though insanity acquitees (commonly called NGRI's) have never been treated like civil patients in Illinois, similar concerns motivated the Illinois legislature when it enacted our GBMI law in 1981. [Citation.] The intent of the law was to reduce the number of NGRI's by giving the jury an alternative to either finding the defendant guilty or not guilty by reason of insanity. It was thought that the GBMI finding would be less harsh than a guilty finding because the defendant would receive treatment while in prison." Report of the Governor's Commission to Revise the Mental Health Code of Illinois, at 59-60 (1989) (hereinafter Report of the Governor's Comm'n).

Moreover, the Commission concluded that the circumstances that led Michigan's legislature to enact a GBMI statute were not present in Illinois. The Commission explained the difference thusly:

"[Unlike Michigan,] Illinois has never treated NGRI's like civil committees in terms of either the conditions of their confinement or the procedures for release. NGRI's [in Illinois] bear the burden of proving their entitlement to release by clear and convincing evidence. Additionally, all releases, even temporary or conditional ones, must be approved by the judge who conducted the criminal trial. These provisions have resulted in extremely low recidivism rates for released insanity acquitees." Report of the Governor's Comm'n, at 60-61.

In calling for the abolition of the GBMI verdict, the Commission reasoned that it had failed to achieve its intended goals and that it had caused a number of negative consequences. The Commission initially determined that there was little evidence that the enactment of the GBMI statute had reduced the number of acquittals by reason of insanity. Report of the Governor's Comm'n, at 60. As to the mental health treatment GBMIs receive in prison, the Commission concluded: "[T]he actual treatment provided for GBMI's is identical to other prisoners. No special units or programs have been established for the small group; they are not housed in any special facility; and no GBMI is currently confined in a [Department of Mental Health and Developmental Disabilities] facility." Report of the Governor's Comm'n, at 61.

The Commission also focused on two negative consequences of a GBMI verdict. First, it found that GBMIs were stigmatized in the

general prison population and, as a result, maltreated. Second, the Commission noted potential jury confusion caused by the verdict and described anecdotal evidence of a jury's confusion when deliberating a case involving GBMI instructions.

"Recently, in Cook County [a] mistrial was declared in a murder trial because of a hung jury. The jury was split between finding the defendant guilty and guilty but mentally ill. Because the jury did not understand that there was no difference between the guilty and guilty but mentally ill disposition, the defendant must either be released or retried. This is true though none of the jurors, at the time their deliberations ended, favored an acquittal or an acquittal by reason of insanity." Report of the Governor's Comm'n, at 61.

Further, since their enactment in a number of states,[ '] GBMI statutes have been the source of considerable controversy. A number of national associations, including the American Bar Association (ABA) and the American Psychiatric Association, have declared their opposition to such legislation. For example, the ABA has described the GBMI verdict as:

"[N]ot a proper verdict at all. Rather it is a dispositional mechanism transferred to the guilt determination phase of the criminal process. The hybrid nature of the verdict is demonstrated by the fact that a jury determination of mental illness at the time of a charged offense is relevant not to criminal responsibility or culpability but to whether the accused persons might receive treatment after they have been sentenced." (Emphasis omitted.) ABA Criminal Justice Mental Health Standard 7—6.10, Commentary, at 393-94 (1988).

In the supreme court case of *People v. Fierer*, 124 Ill. 2d 176, 184 (1988), the defendant argued, *inter alia*, "that the [GBMI] verdict, on its face, is an unconstitutional denial of due process, because it interjects irrelevant, misleading elements into the determination of guilt or innocence." The *Fierer* court reversed the case on other grounds, not reaching the issue of the GBMI statute's constitutionality. *Fierer*, 124 Ill. 2d at 184.

Regarding this issue, defendant makes two arguments that the GBMI statute violates defendant's due process. First, defendant contends that the GBMI verdict misleads and confuses jurors into believing they can assign a lower level of culpability, and a correspondingly lower level of punishment, to a mentally ill defendant. Defendant maintains that, in reality, a GBMI verdict, based upon the subject statute, is no more than a guilty verdict with the addition of a phrase, "but mentally ill," which is devoid of meaning or consequences. Defendant maintains that, by misleading jurors in this way,

the GBMI statute encourages compromise verdicts in violation of due process.

Second, defendant argues that the allocation of the burden of proof under the current version of the GBMI statute results in the defendant being required to prove something that is fundamentally at odds with his defense of insanity. In defendant's view, under the GBMI statute, whenever the defendant pleads insanity, the trial court is allowed to instruct the jury that the defendant is required to prove that he is *not* insane. Placing this burden on the defendant simply introduces another level of confusion to the deliberation process and furthers the jury's misperception that a GBMI verdict is of some value to a defendant. Defendant contends that, since no rational basis exists for assigning this burden to the defense, the GBMI statute violates fundamental guarantees of due process.

Initially, the State makes the following observations. Generally, it maintains that the GBMI statute has had the following salutary effects. Without the GBMI statute, in cases where the jury did not return a verdict of not guilty by reason of insanity, prior law made no provision for a determination as to whether the jury rejected the defense in its entirety or whether it accepted the evidence of a mental dysfunction but nevertheless concluded that defendant could conform his conduct to the law's requirements. Thus, the State maintains that, in this type of situation, without the GBMI statute, the trial court, in determining the defendant's sentence, would be left to speculate whether the person acted under the influence of "mental dysfunction." The State also maintains that the GBMI statute can also be important from the standpoint of the defendant's incarceration. While conceding that the statute makes no requirement of any psychiatric prison treatments, the State contends that the finding of "mental dysfunction" can be useful in the Department of Corrections' evaluation of treatment needs and determination of the place of confinement.

Regarding the arguments specifically raised by defendant, the State makes the following responses. As to defendant's assertion that the GBMI statute misleads and confuses jurors, the State maintains that this argument ascribes to jurors a concern as to the meaning and effect of their verdict, which runs contrary to their functions of determining the credibility of witnesses and the weight to be given their testimony, and of making inferences from the evidence. The State further contends that this basic principle of the jury's function also refutes defendant's complaints as to the imposition of the burden of proof on him to prove a mental disorder for purposes of the GBMI verdict. As to defendant's burden of proof argument, the State

maintains that defendant ignores the fact that in asserting the insanity defense he had already assumed the burden of proving mental disease or defect. The State asserts that the GBMI verdict does not create a burden to prove "noninsanity" but, instead, represents defendant's failure to prove his entire insanity defense.

In his reply brief, defendant asserts that the State attempts to rewrite the relevant statutory language to its own purpose. Defendant contends that the State, in so doing, ignores the fact that the definitions of the terms "mental illness" and "mentally ill" found in the insanity statute are contrary to the statutory definition of insanity. Defendant maintains that these terms are defined as a condition whereby a defendant does not meet the statutory definition of insanity. Defendant further disagrees with the State's view that GBMI is merely an alternative verdict to not guilty by reason of insanity (NGRI), containing no disparate elements and requiring proof of some but not all elements of the insanity defense. Defendant argues that the language of the GBMI statute defines "mental illness" separately and disparately from insanity and, further, that the GBMI statute definition of "mental illness" has been interpreted by the supreme court as requiring proof of "noninsanity." See *People v. Fierer*, 124 Ill. 2d 176, 191 (1988).

Moreover, defendant notes that the State does not dispute his contention that jurors presented with a GBMI verdict will be misled as to the meaning of the verdict and will determine the issue of criminal responsibility on the basis of speculation or impermissible compromise. Defendant also maintains that the State's view of the inviolability of the jury's function ignores those occasions in which the State encourages a jury to reach a verdict based on speculation and misinformation.

## Compromise Verdicts

■ We first address defendant's contention that the GBMI statute encourages compromise verdicts in violation of due process. Initially, we note that a statute that encourages compromise verdicts based upon jurors' misperceptions and misunderstandings is a violation of due process. *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979).

■ The wording of the GBMI statute would seem to indicate that there is some sort of significance to the phrase "but mentally ill." Certainly, the instant jury, which confusedly struggled with the definition of mental illness that it had been given, wondering if somehow the definition had a typographical error, placed great emphasis upon the words it was given. In all probability, such a jury would look at the subject phrase and infer that it carried some significance.

Yet, as the supreme court has found, a GBMI verdict does not reflect diminished culpability or criminal responsibility. *People v. Crews*, 122 Ill. 2d 266, 278 (1988). Moreover, a GBMI verdict is identical to a "guilty" verdict in terms of potential punishment and/or psychiatric treatment. *Crews*, 122 Ill. 2d at 277. Further, as of 1989, the psychiatric treatment afforded those found GBMI was identical to that of other prisoners. There were no separate facilities for them at any penal institutions, and none were receiving treatment in a psychiatric facility. Report of the Governor's Comm'n, at 62. We are aware of no evidence that any of this has changed significantly in the intervening years. From this, we conclude that the GBMI statute has no practical effect.

In reviewing the relevant decisions of other jurisdictions, we find that two dissents most accurately describe the GBMI's verdict's effect upon jurors.

In his dissent in *Mitchell v. Commonwealth*, 781 S.W.2d 510, 513 (Ky. 1989), Justice Leibson wrote:

> "I have no doubt but that many jurors think that finding the defendant Guilty But Mentally Ill means that the defendant will be committed to a mental institution for treatment, instead of prison ***. Few, if any, will realize that the 'but mentally ill' finding is, for all practical purposes, empty of legal consequences ***." *Mitchell*, 781 S.W.2d at 513 (Leibson, J., dissenting).

Further, jurors' unawareness of this lack of legal consequences of the GBMI verdict "induces compromise verdicts by seducing jurors into settling on a middle ground between guilty and not guilty, when in fact there is no middle ground." *State v. Neely*, 112 N.M. 702, 714, 819 P.2d 249, 261 (1991) (Montgomery, J., concurring in part & dissenting in part).

We have little doubt that conscientious jurors who are confronted with this continuum of verdicts assume that the GBMI verdict represents a distinct and separate position on this continuum. In all probability, they further assume that the GBMI verdict indicates that some sort of ameliorative disposition will be afforded the defendant. We find that these misconceptions and misunderstandings encourage a compromise verdict of GBMI, which is devoid of any substance.

The State erroneously insists that the jurors are only to stick to their essential functions, namely, determining the credibility of the witnesses, attaching weight to the testimony, and drawing inferences from the evidence. In reality, juries can be, and sometimes are, misled, with the result that convictions are overturned and causes remanded. See, *e.g., People v. Malkiewicz*, 86 Ill. App. 3d 417 (1980).

Moreover, the very title of the GBMI statute encourages jurors to draw natural inferences from it.

We conclude that the GBMI statute encourages compromise verdicts and that, as a result, the subject statutory scheme deprives a defendant of due process.

### Burden of Proof

Bearing in mind our determination of the compromise verdict issue, we will also address defendant's argument that the imposition of conflicting burdens of proof deprived him of due process.

In *People v. McCullum*, 66 Ill. 2d 306 (1977), our supreme court stated:

> "Though the legislature has the authority to determine the allocation of the burden of producing evidence and the burden of persuasion, it may not allocate these burdens in a manner that 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *McCullum*, 66 Ill. 2d at 314, quoting *Speiser v. Randall*, 357 U.S. 513, 523, 2 L. Ed. 2d 1460, 1471, 78 S. Ct. 1332, 1341 (1958).

■ Under this statutory scheme, defendant has two conflicting burdens. To achieve a NGRI verdict, defendant must prove by a preponderance of the evidence that, at the time of the offense, "he lack[ed] substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6—2(a) (West 1994). But when the State opts for the GBMI instruction, defendant also has the burden of proving by a preponderance of the evidence that, at the time of the commission of the crime, he was "mentally ill," *i.e.*, suffering from "a substantial disorder of thought, mood, or behavior which afflicted [him] at the time of the commission of the offense and which impaired [his] judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirement of law." 720 ILCS 5/6—2(d) (West 1994). Essentially, in such a circumstance, a defendant has the burden of proving that he did not know what he was doing at the time of the offenses (NGRI), as well as the burden of proving that he knew what he was doing at the pertinent time (GBMI).

This situation is somewhat analogous to one found in *People v. Reddick*, 123 Ill. 2d 184 (1988), where voluntary manslaughter (now second degree murder) and murder instructions were given to the juries. The *Reddick* court determined that the voluntary manslaughter instructions when given along with murder instructions "indicate that to obtain a voluntary manslaughter conviction the People must prove the existence of one of the alternative mitigating mental condi-

tions which the People contend did not exist." *Reddick*, 123 Ill. 2d at 194. The supreme court explained that, if a jury properly followed the instructions, a defendant could not possibly be convicted of voluntary manslaughter due to the fact that, if a mitigating mental state was proved, it would have been done so by the defendant, not the State. *Reddick*, 123 Ill. 2d at 194-95. The *Reddick* court held it was error to place the burden of proof on the State.

The State argues that *Reddick* has no bearing on this cause because the alternative verdict of GBMI has no disparate elements but, instead, requires proof of some, but not all, of the elements of the insanity defense.

Contrary to the State's position, we find that *Reddick* lends support to defendant's position. In order to obtain a GBMI conviction, the defendant, akin to the State in *Reddick,* had to prove the existence of a culpable state of mind which he had maintained throughout the trial did not exist. Rather, it was the State that offered extensive evidence and argument that defendant was not legally insane at the time of the murders. Under these circumstances, the jury could not possibly have returned a verdict of GBMI because it would have been proved by the State, not defendant. *Reddick*, 123 Ill. 2d at 194-95.

We find that this imposition of conflicting burdens upon defendant was fundamentally unfair. It placed defendant in an untenable position, depriving him of his due process rights. Further, as we have already found, the GBMI statute encourages compromise verdicts. The imposition of conflicting burdens on defendant only adds more confusion in cases where the insanity defense has been raised.

We take note of the dissent's contention that we are ignoring precedent in reaching these determinations regarding the GBMI statute. First, the cases cited by the dissent are not binding on this court. Second, neither of the parties cited the cases pointed to in the dissent. It is apparent that both the State and the defendant sought to have this issue decided on the merits of their arguments, not by this court's reliance on unbinding precedent.

■ Further, because of our determination of the unconstitutionality of the GBMI statute, we must address the question of whether the evidence presented at trial was sufficient to prove that defendant was guilty beyond a reasonable doubt. See, *e.g., People v. Taylor,* 76 Ill. 2d 289 (1979). We find that there was sufficient evidence presented at trial to prove defendant guilty beyond a reasonable doubt. In so determining, we make no finding of defendant's innocence or guilt that would be binding in a new trial. We merely are determining that defendant's constitutional right against double jeopardy will not be abridged by a new trial.

For the reasons stated above, we reverse the judgment of the circuit court of Du Page County and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded.

McLAREN, J., concurs.

JUSTICE THOMAS, dissenting:
Illinois courts have repeatedly upheld the constitutionality of the GBMI statute while rejecting the present defendant's same arguments. *People v. Seaman*, 203 Ill. App. 3d 871, 884-88 (1990) (rejected argument that statute was unconstitutional because it leads to compromise verdicts and jury confusion); *People v. Smith*, 124 Ill. App. 3d 805, 807-12 (1984) (rejected arguments that danger of compromise verdict and stigma associated with verdict of GBMI rendered statute unconstitutional); *People v. DeWit*, 123 Ill. App. 3d 723, 735-36 (1984) (rejected argument that GBMI verdict promotes jury confusion and leads to a compromise verdict); *People v. Fields*, 170 Ill. App. 3d 1, 6-7 (1988) (declined to reexamine decisions upholding the constitutionality of the GBMI statute); see also *People v. Martin*, 166 Ill. App. 3d 428, 435 (1988); *People v. Boatright*, 137 Ill. App. 3d 888, 890-91 (1985); *People v. Carter*, 135 Ill. App. 3d 403 (1985). Numerous states in addition to Illinois have also enacted legislation providing for a verdict of guilty but mentally ill. Annotation, *"Guilty But Mentally Ill" Statutes: Validity & Construction*, 71 A.L.R.4th 702 (1989) (hereinafter 71 A.L.R.4th 702). Despite being faced with basically the same challenges raised by the defendant in the present case, all of the various state statutes have been upheld. See *State v. Neely*, 112 N.M. 702, 704, 819 P.2d 249, 251 (1991); 71 A.L.R.4th 702.

Since the majority intends to ignore well-established precedent, I will reiterate some of the principles upon which the above-cited decisions rest and which are by now axiomatic. A statute carries a strong presumption of constitutionality, and the burden of showing its invalidity is on the person challenging the enactment. *People v. Grano*, 286 Ill. App. 3d 278, 295 (1996). When determining whether a statute violates due process, the court must determine whether the statute is designed to remedy the evils the legislature has determined to be a threat to the public health, safety, and general welfare. *Seaman*, 203 Ill. App. 3d at 885. Due process requires only that the statute be reasonably designed to accomplish its purposes, not that it be the best means of accomplishing them. *Seaman*, 203 Ill. App. 3d at 885.

It has been repeatedly held that, because the GBMI statute is

clearly rationally designed to accomplish the legislative goal of reducing the number of persons erroneously found not guilty by reason of insanity and to identify such defendants as in need of treatment, the statute does not violate due process. *Seaman*, 203 Ill. App. 3d at 885; *Smith*, 124 Ill. App. 3d at 811. The statute is reasonably designed to accomplish a legitimate purpose of the state. The verdict clarifies for the jury the distinction between a person who is not guilty by reason of insanity and one who is mentally ill yet not insane and, therefore, is criminally liable. By focusing the jury's attention on the question of legal culpability, the statute increases the likelihood that the jury will return a verdict in accord with the appropriate legal standard, and it is a legitimate state interest to have juries returning verdicts that accord with the law. The legislature could have believed that some defendants were being found not guilty by reason of insanity even though they did not satisfy the legal standard for the defense. That the majority cites a report critical of the legislature's remedy is irrelevant since the remedy need not be the best means to accomplish the statute's purpose but only reasonably designed to accomplish its purpose to withstand constitutional attack.

The majority erroneously concludes that the GBMI verdict is without legal consequence. This court has recognized that, upon a finding of guilty but mentally ill, the Department of Corrections must " 'cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness' and to provide 'such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary.' " *People v. Morris*, 237 Ill. App. 3d 140, 145 (1992), quoting Ill. Rev. Stat. 1989, ch. 38, par. 1005—2—6(b). Moreover, this court in *Morris* recognized that a GBMI verdict could work to the defendant's advantage in sentencing and remanded the cause to make sure the trial judge considered the defendant's mental illness in imposing sentence. *Morris*, 237 Ill. App. 3d at 145. Given that the verdict serves to identify mentally ill defendants in need of treatment and facilitates just the sentencing of mentally ill defendants, it is not without legal consequence as the majority argues.

The majority's discussion about the lack of treatment provided by the Department of Corrections to mentally ill inmates is a red herring. The Department of Corrections' noncompliance with the statutory mandate for evaluation and treatment does not render an otherwise constitutional statute unconstitutional. If the defendant is in need of treatment but is not receiving it, then the appropriate remedy is a suit to compel the State to provide treatment. *United States ex rel. Weismiller v. Lane*, 815 F.2d 1106 (7th Cir. 1987). At

any rate, this is not the appropriate forum to determine whether the sentencing and treatment provisions of the guilty but mentally ill statute are being complied with.

I also disagree with the majority's conclusion that the statute places a conflicting burden of proof on the defendant. By raising the insanity defense, the defendant has already assumed the burden of proving that he is so mentally ill that he is legally insane. I do not view the GBMI statute as requiring the defendant to prove he is *not* insane. Rather, the current statute simply recognizes that the defendant will be the party presenting evidence of insanity, not the State, and that in the course of doing so the defendant may have failed to prove legal insanity but may have proved that he was mentally ill. In such a case, the defendant can avail himself of the GBMI verdict. The majority's reliance on *Reddick* is misplaced because in the present case defendant must first be found guilty of the essential elements of the crime and then found legally sane before the GBMI verdict may be properly considered by the jury. See *Seaman*, 203 Ill. App. 3d at 886; *Smith*, 124 Ill. App. 3d at 811. Since the defendant has already been proved guilty with the requisite mental state before the jury considers the GBMI verdict, *Reddick* has no application here.

Because I would follow the long line of cases upholding the constitutionality of the GBMI statute, I respectfully dissent.