**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 24 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JUDITH ANN NEELY,

          Petitioner-Appellant,

v.

TOM NEWTON, Warden;
ATTORNEY GENERAL FOR THE
STATE OF NEW MEXICO,

          Respondents-Appellees,

No. 97-2161

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-95-0569-SC/RLP)**

Thomas B. Jameson, Assistant Federal Public Defender, Albuquerque, New Mexico, for Petitioner-Appellant.

Patricia A. Gandert, Assistant Attorney General, State of New Mexico, Santa Fe, New Mexico, (Tom Udall, Attorney General, State of New Mexico, Santa Fe, New Mexico; Elizabeth Blaisdell, Assistant Attorney General, State of New Mexico, Santa Fe, New Mexico, with her on the brief), for Respondents-Appellees.

Before **PORFILIO, LOGAN,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

Petitioner Judith Neely appeals from the district court's dismissal of her federal habeas corpus petition, brought pursuant to 28 U.S.C. § 2254, following her convictions, sentencing, and appeal in New Mexico state courts. A jury found Neely guilty but mentally ill ("GBMI") of first-degree murder, three counts of attempted murder, and two counts of aggravated battery. On appeal, Neely asserts (1) New Mexico's GBMI statute deprives a mentally ill defendant of due process and a fair trial, in violation of the Fourteenth Amendment; (2) New Mexico's GBMI statute subjects a mentally ill defendant to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments; and (3) the trial court's restriction of voir dire and its refusal to instruct the jury on the consequences of the not-guilty-by-reason-of-insanity ("NGRI") and GBMI verdicts deprived her of due process and a fair trial.

This court exercises jurisdiction pursuant to 28 U.S.C. § 2253. We construe Neely's request for a certificate of appealability as a request for a

certificate of probable cause,[1] grant it, and affirm the district court's dismissal of her petition.

## I. BACKGROUND

Neely has a long history of mental illness, including schizophrenia and manic depression. During the ten years she was under the care of her psychiatrist, she was hospitalized five times. In May 1989, approximately six weeks after her last hospitalization, Neely drove her car into a family of four, killing one member and injuring two others. The sole issue at Neely's trial was whether she was criminally insane at the time of the offenses. The jury, rejecting her insanity defense, found her guilty but mentally ill of the charged offenses. The trial court sentenced her to life imprisonment plus twenty-seven years.

Neely appealed to the New Mexico Supreme Court, which affirmed her convictions. *See State v. Neely*, 819 P.2d 249, 260 (N.M. 1991) [hereinafter *Neely I*]. Among other things, the court held that New Mexico's GBMI statute does not violate a mentally ill defendant's right to due process and a fair trial; that the GBMI statute does not violate the Eighth Amendment's proscription

---

[1]The certificate of appealability provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) contained in 28 U.S.C. § 2253(c) do not apply to petitioners who filed prior to AEDPA's effective date of April 24, 1996. *See United States v. Kunzman*, 125 F.3d 1363, 1364 n.2 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 1375 (1998). For Neely to appeal her pre-AEDPA claims, a certificate of probable cause under former 28 U.S.C. § 2253 is required.

against cruel and unusual punishment; and that Neely was not entitled to a jury instruction on the consequences of the NGRI and GBMI verdicts nor was she entitled to question the venire panel concerning those consequences.[2] *See id.* at 251-57.

Upon remand, Neely filed a motion asking the trial court to reconsider its sentence and requesting that the court sentence her to an appropriate mental facility where she could receive treatment for her mental illness. The trial court denied her motion, and Neely again appealed to the state supreme court. The state supreme court held that because she was convicted of first-degree murder, the trial court lacked discretion to sentence her to a mental facility.[3] *See State v. Neely*, 876 P.2d 222, 225 (N.M. 1994) [hereinafter *Neely II*].

---

[2]The majority decision sparked a strong dissent from Justice Montgomery, who argued the state's GBMI verdict was "little more than a charade--a subterfuge that surreptitiously deprives defendants suffering from mental illness of the defense of insanity." *State v. Neely*, 819 P.2d 249, 264 (N.M. 1991) [hereinafter *Neely I*] (Montgomery, J., concurring in part and dissenting in part). Another justice specially concurred, strongly suggesting that in the future the jury be given appropriate instructions to disabuse them of any misconception they might have that the GBMI verdict has consequences different from a guilty verdict. *See id.* at 260 (Ransom, J., specially concurring).

[3]Justice Montgomery specially concurred, stating the *Neely II* court's conclusion that the trial court lacked discretion to sentence a mentally ill defendant convicted of first-degree murder to a mental facility "severely undercuts the rationale of the majority's opinion in *Neely I.*" *State v. Neely*, 876 P.2d 222, 226 (N.M. 1994) [hereinafter *Neely II*] (Montgomery, C.J., specially concurring).

Neely next filed a petition for habeas corpus relief in federal district court and raised the same issues resolved by the New Mexico Supreme Court. The district court adopted the proposed findings and the recommended disposition of the magistrate judge and dismissed the petition with prejudice. From this dismissal, Neely appeals.

## II. DISCUSSION

### A. Applicability of Supreme Court Precedent

Before addressing the merits of Neely's due process challenge, this court must first determine the effect on this appeal of the Supreme Court's summary dismissal in *Hardesty v. Michigan*, 477 U.S. 902 (1986). Hardesty appealed to the Supreme Court from a decision of the Michigan Court of Appeals,[4] which, *inter alia*, rejected his federal constitutional challenge to Michigan's GBMI statute. *See People v. Hardesty*, 362 N.W.2d 787, 798 (Mich. Ct. App. 1984), *appeal denied*, 424 Mich. 877, *appeal dismissed*, 477 U.S. 902 (1986). The

---

[4]Hardesty applied for leave to appeal to the Michigan Supreme Court, which denied his application. *See People v. Hardesty*, 424 Mich. 877, *appeal dismissed*, 477 U.S. 902 (1986). Hardesty thereafter properly appealed to the Supreme Court pursuant to 28 U.S.C. § 1257(2) (amended 1988), which at the time provided that final judgments rendered by "the highest court of a State in which a decision could be had" may be appealed as of right to the Supreme Court when the validity of a state statute is upheld in the face of a federal constitutional challenge.

Supreme Court summarily dismissed his appeal for want of a substantial federal question. *See Hardesty v. Michigan*, 477 U.S. 902 (1986).

In *Hicks v. Miranda*, 422 U.S. 332 (1975), the Supreme Court held that summary affirmances and summary dismissals for want of a substantial federal question are considered decisions on the merits, and lower courts are thereby bound by the summary actions "'unless and until the Supreme Court should instruct otherwise.'" *Id.* at 344 (quoting *Port Auth. Bondholders Protective Comm. v. Port of New York Auth.*, 387 F.2d 259, 263 n.3 (1967)). The Supreme Court noted that a lower court must first ascertain what issues were properly presented and declared by the Court to be without substance in order to determine whether its summary action is controlling precedent. *See id.* at 345 n.14. The Court recognized that "[a]scertaining the reach and content of summary actions may itself present issues of real substance." *Id.*

Two years after its decision in *Hicks*, the Supreme Court provided further guidance, stating that such actions "without doubt reject the specific challenges presented in the statement of jurisdiction and . . . leave undisturbed the judgment appealed from." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). The Court further counseled that summary actions "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Id.* The Court cautioned, however, that the precedential

significance of a summary action "is to be assessed in light of all of the facts in that case." *Id.* at 177.

In his jurisdictional statement, Hardesty stated the relevant issue for review as follows:

> Whether Michigan's statutes allowing a verdict of guilty but mentally ill unconstitutionally infringe on the rights to a fair jury trial and to present an insanity defense, where the trial judge instructed on the verdict over defense objection and the jury found Appellant Hardesty to be guilty but mentally ill on all seven counts.

Jurisdictional Statement, *Hardesty v. Michigan*, No. 85-6850 (1986), at 1. In arguing the question presented was substantial, Hardesty stated the "objective in creating the GBMI legislation is to induce 'compromise' guilty verdicts." *Id.* at 19. He further argued that "some commentators have found that [the GBMI verdict] violates due process" because the verdict deprives legally insane defendants of their right to present an insanity defense. *Id.* at 19-20.

At first glance, the issue presented by Hardesty appears to be the same due process issue Neely presents to this court.[5] Delving further into Hardesty's jurisdictional statement, however, two important distinctions between Hardesty's

---

[5]Indeed, the Seventh Circuit, in upholding the constitutionality of Illinois' GBMI statute, concluded that the *Hardesty* dismissal controlled the issue of whether the Illinois statute created an impermissible risk of jury compromise. *See United States ex rel. Weismiller v. Lane*, 815 F.2d 1106, 1113 (7th Cir. 1987). The court, however, independently rejected the challenge to the statute in the event that it "overstated the precedential effect of *Hardesty*." *Id.*

case and Neely's case emerge. First, Hardesty states the jury in his case was instructed on the consequences of both a NGRI verdict and a GBMI verdict. *See id.* at 14. In contrast, one of Neely's arguments is partially premised on the trial court's refusal to instruct the jury on the consequences of the two verdicts. Second, Hardesty states in his jurisdictional statement that a defendant found GBMI is "eligible for treatment of his mental illness in prison or a mental hospital while incarcerated." *Id.* at 19. Neely, however, claims the trial court's lack of discretion to commit her to a mental facility undermines the constitutionality of New Mexico's GBMI statute. That the Michigan Court of Appeals in *Hardesty* did not explicitly rely on these two factors in upholding the state's GBMI statute is of no consequence. The Supreme Court has cautioned that for purposes of determining the binding effect of a summary action, the action should not be interpreted as adopting the rationale of the lower court, but rather as affirming only the judgment of that court. *See Mandel*, 432 U.S. at 176.

The referenced differences between Hardesty's and Neely's cases compel the conclusion that the Supreme Court's summary dismissal in *Hardesty* is not controlling precedent in this case. This court must therefore address Neely's due process challenge. *Cf. Lecates v. Justice of Peace Court No. 4*, 637 F.2d 898, 907 (3d Cir. 1980) ("To avoid our duty to decide a case properly before us by an unquestioning reliance on [the summary dismissal in] *Caulk*, where critical

differences appear between the two cases, would retard the development of constitutional principles . . . .").

**B.     Due Process and Right to Fair Trial**

Neely argues that New Mexico's GBMI statute violates a mentally ill defendant's right to due process and a fair trial. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Whether the GBMI statute contravenes the United States Constitution is a question of law which this court reviews de novo. *See Stephens v. Thomas*, 19 F.3d 498, 500 (10th Cir. 1994).

Unlike the insanity defense, which has its roots in ancient Judaic, Christian, and Roman law, the GBMI verdict first appeared in 1975, when Michigan enacted its GBMI statute. *See* Ira Mickenberg, *A Pleasant Surprise: The Guilty but Mentally Ill Verdict Has Both Succeeded in its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense*, 55 U. Cin. L. Rev. 943, 954, 987 (1987). It was not until 1982, however, when John Hinckley was found not guilty by reason of insanity for his attempt on President Reagan's life,[6] that other states began to follow Michigan's lead. *See id.* at 946-47; Mark A. Woodmansee*, Comment, *The Guilty but Mentally Ill Verdict: Political Expediency at the Expense of Moral Principle*, 10 Notre Dame J.L. Ethics & Pub.

---

[6]*See United States v. Hinckley*, 672 F.2d 115 (D.C. Cir. 1982).

Pol'y 341, 341-45 (1996). To date, thirteen states have enacted some form of

GBMI legislation.[7]

Despite mixed reviews by commentators, the judiciary has been largely

unwilling to strike down GBMI statutes as unconstitutional. *See, e.g.*, *United*

*States ex rel. Weismiller v. Lane*, 815 F.2d 1106, 1109-13 (7th Cir. 1987); *Taylor*

*v. State*, 440 N.E.2d 1109, 1111-13 (Ind. 1982); *People v. Ramsey*, 375 N.W.2d

297 (Mich. 1985); *State v. Baker*, 440 N.W.2d 284, 287-90 (S.D. 1989). Only an

intermediate appellate court in Illinois has held that its GBMI statute deprives

mentally ill defendants of due process. *See People v. Robles*, 682 N.E.2d 194,

205 (Ill. App. Ct.), *appeal allowed*, 686 N.E.2d 1170 (Ill. 1997). In reaching its

conclusion, the *Robles* court rejected numerous decisions by other branches of the

appellate court upholding Illinois' GBMI statute.[8] *See id.* at 206-07 (Thomas, J.,

dissenting) (collecting cases).

---

[7]These 13 states are Alaska, Alaska Stat. § 12.47.030; Delaware, Del. Code Ann. tit. 11, § 401(b); Georgia, Ga. Code Ann. § 17-7-131; Illinois, 725 Ill. Comp. Stat. Ann. 5/115-3(c), -4(j); Indiana, Ind. Code Ann. § 35-36-2-3; Kentucky, Ky. Rev. Stat. Ann. §§ 504.120, .130; Michigan, Mich. Comp. Laws Ann. § 768.36; Nevada, Nev. Rev. Stat. § 174.035; New Mexico, N.M. Stat. Ann. §§ 31-9-3 to -4; Pennsylvania, 18 Pa. Cons. Stat. Ann. § 314; South Carolina, S.C. Code Ann. § 17-24-20; South Dakota, S.D. Codified Laws § 23A-26-14; and Utah, Utah Code Ann. §§ 77-16a-103 to -104 ("guilty *and* mentally ill").

[8]The Illinois intermediate appellate court operates as a nonunitary system. Therefore, opinions of any one branch of the appellate court, while binding on the circuit courts in Illinois, are not binding on the other branches of the appellate court. *See Garcia v. Hynes & Howes Real Estate, Inc.*, 331 N.E.2d 634, 636 (Ill. App. Ct. 1975).

Under the New Mexico GBMI scheme, if a defendant asserts a defense of insanity, the trial court provides the jury with a special verdict form of GBMI and instructs the jury that it may return a verdict of GBMI instead of a verdict of guilty or not guilty. *See* N.M. Stat. Ann. § 31-9-3(E). The jury may return a verdict of GBMI only if it finds beyond a reasonable doubt that the defendant (1) committed the charged offense, (2) was not legally insane[9] at the time of the commission of the offense, and (3) was mentally ill at the time of the commission of the offense.[10] *See id.* Unlike a defendant found legally insane, a defendant found GBMI is held criminally responsible for her conduct. *See id.* § 31-9-3(A). In sentencing a defendant found GBMI, the court may impose any sentence that could be imposed on a defendant found guilty of the same offense. *See id.* § 31-9-4. If the mentally ill defendant is incarcerated, the corrections department is required to "examine the nature, extent, continuance and treatment of the

---

[9]To be considered "legally insane" under New Mexico law, the jury must find the defendant "'as a result of disease of the mind . . . (a) did not know the nature and quality of the act or (b) did not know that it was wrong or (c) was incapable of preventing himself from committing it.'" *Neely I*, 819 P.2d at 254 (ellipses in original) (quoting *State v. Dorsey*, 603 P.2d 717, 719 (N.M. 1979)).

[10]The term "mentally ill" is defined as
a substantial disorder of thought, mood or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he did not know what he was doing or understand the consequences of his act or did not know that his act was wrong or could not prevent himself from committing the act.
N.M. Stat. Ann. § 31-9-3(A).

-11-

defendant's mental illness and . . . provide psychiatric, psychological and other counseling and treatment for the defendant as it deems necessary." *Id.*

In support of her argument that New Mexico's GBMI statutory scheme deprives mentally ill defendants of due process, Neely contends the verdict infringes on her interest in a fair determination of whether she was guilty or not guilty by reason of insanity. According to Neely, the GBMI verdict falsely promises a middle ground between an absolute guilty verdict and a NGRI verdict, leading to compromise verdicts. She further argues the GBMI statute does not serve a legitimate state interest.

In *Neely I*, the New Mexico Supreme Court determined there were legitimate purposes for the GBMI statute. First, the court stated the statute "increases the likelihood that the jury will return a verdict in accordance with the appropriate legal standards--and it is a legitimate state interest to see juries return verdicts that accord with the law." *Neely I*, 819 P.2d at 252. According to the court, the GBMI verdict "clarifies for the jury the distinction between a defendant who is not guilty by reason of insanity and one who is mentally ill yet not criminally insane and, therefore, is criminally liable." *Id.* Thus, the verdict may "reduce the number of improper or inaccurate insanity acquittals." *Id.*

Neely, on the other hand, argues the GBMI statute increases verdict inaccuracy rather than verdict accuracy. In support of her argument, Neely

contends the GBMI verdict is illusory and is designed to divert the jury's attention from deciding the ultimate issue of guilt or innocence, thus leading juries to improperly convict defendants who are legally insane. Neely also relies on data that few defendants even raise the issue of insanity and those who do are rarely successful.

This court agrees with the *Neely I* court that New Mexico has a legitimate interest in ensuring its juries decide cases in accordance with the law. *See id.*; *see also Weismiller*, 815 F.2d at 1112. We also agree that the GBMI verdict may assist a jury presented with an insanity defense in determining the culpability of the defendant. *See Neely I*, 819 P.2d at 252-53 (citing *Weismiller*, 815 F.2d at 1112). Admittedly, the addition of another possible verdict in an insanity trial may complicate the jury's task. *See Ramsey*, 375 N.W.2d at 301. The GBMI verdict, however, may actually serve to clarify the jury's duty by disclosing gradations of criminal responsibility: a defendant who is mentally ill, but not insane, at the time of the commission of the offense must be held responsible for her conduct. *See Neely I*, 819 P.2d at 252-53 (citing *Weismiller*, 815 F.2d at 1112); *Baker*, 440 N.W.2d at 288.

Importantly, before finding a defendant GBMI, the jury must first find beyond a reasonable doubt that the defendant was not legally insane. *See* N.M. Stat. Ann. § 31-9-3(E). Neely offers no independent evidence to support her

claim that the addition of the GBMI verdict distracts a jury from making that determination. *Cf. Weismiller*, 815 F.2d at 1112 (rejecting defendant's argument that availability of GBMI verdict leads to compromise verdicts and noting empirical data "casts doubt" on the argument); *Ramsey*, 375 N.W.2d at 302 (finding defendant's compromise verdict claim to be speculative and noting argument presumes jury compromise anytime multiple verdicts are submitted to the jury).

Finally, even if erroneous insanity acquittals are not a significant problem in New Mexico, the state legislature may still act to remedy what it perceives to be a problem. This court does not judge the wisdom of the legislature's enactment of the GBMI statute. *See Bensing v. United States*, 551 F.2d 262, 265 (10th Cir. 1977) ("A court must be ever alert to refuse to sit as a super-legislature to weigh the wisdom of legislation, or to invoke the Due Process Clause so as to strike down laws or regulations simply because the Court may believe that they are unwise or improvident.").

The second state interest identified by the New Mexico Supreme Court is that the GBMI statute "may assist in identification of convicted defendants in need of psychiatric treatment." *Neely I*, 819 P.2d at 252. According to the court, the GBMI verdict allows the "jury to signal to the sentencing court and the

department of corrections that in its judgment after having considered the facts presented the defendant is a person in need of evaluation." *Id.* at 253.

Neely argues the court's reasoning is defective because the jury is not instructed on the consequences of the NGRI and GBMI verdicts and, indeed, is expressly told not to consider the consequences of its verdict. The jury need not be informed of the consequences of a GBMI verdict in order for the verdict to have the effect of signaling to the sentencing court or the corrections department that the defendant may be in need of psychiatric treatment. The jury accomplishes this purpose simply by finding the defendant mentally ill.

Neely also argues the GBMI verdict is an ineffective method of identifying defendants presently in need of treatment because the jury evaluates the defendant's mental state at the time of the commission of the offense, rather than the defendant's mental state at the time of trial. The asserted purpose of the verdict, however, is to identify those defendants who will likely need treatment, not to make a clinical determination of whether the defendant's mental condition at the time of trial necessitates treatment. By finding a defendant mentally ill, the jury ensures that those who are qualified to make such a determination will further evaluate the defendant. *See* N.M. Stat. Ann. § 31-9-4 (providing that if defendant is found GBMI and is sentenced to the custody of the corrections department, the department "shall examine the nature, extent, continuance and

treatment of the defendant's mental illness"); *see also Weismiller*, 815 F.2d at 1111 ("[I]t cannot be said that the state is not assisted in its obligation to provide treatment to those who need it by a statute which identifies a class which is most likely to need it.").

While the New Mexico Supreme Court in *Neely I* identified a third state interest underlying the GBMI statute,[11] this court need not address this interest in light of our agreement that legitimate state interests are furthered by the statute. Moreover, this court rejects Neely's argument that the GBMI statute infringed on her interest in a fair determination of her guilt or innocence. Consequently, we reject her argument that New Mexico's GBMI statute violates a mentally ill defendant's due process rights and right to a fair trial.

## C.    Cruel and Unusual Punishment

Neely next argues New Mexico's GBMI statute subjects mentally ill defendants such as Neely to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments. She also argues that her specific sentence constitutes cruel and unusual punishment. This court reviews her arguments de novo. *See Lustgarden v. Gunter*, 966 F.2d 552, 553 (10th Cir. 1992).

---

[11]The third state interest identified by the *Neely I* court was that the GBMI statute may "facilitate just sentencing of mentally ill defendants." 819 P.2d at 252. In *Neely II*, however, the New Mexico Supreme Court concluded the sentencing court does not have discretion to modify a mentally ill defendant's mandatory life sentence. *See* 876 P.2d at 223.

Relying on the Supreme Court's decision in *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (plurality opinion), Neely first argues that because mentally ill defendants are less able to control their conduct, they should not be held to the same level of criminal liability and sentencing standards as defendants who are not mentally ill. *Thompson*, however, addressed the narrow issue of whether a capital sentence imposed on a defendant who was only fifteen years old at the time he committed his offense violated the Eighth Amendment. *See id.* at 818-19 (plurality opinion). The plurality concluded that "contemporary standards of decency confirm our judgment that such a young person is not capable of acting with the degree of culpability that can justify the ultimate penalty." *Id.* at 823 (plurality opinion).

"[T]he [Supreme] Court has held again and again that the death penalty is a unique punishment that requires special analysis when determining whether its imposition in a particular case passes constitutional muster." *Baker v. Cowley*, 931 F.2d 1394, 1395 (10th Cir. 1991). Given the unique circumstances and issues involved in *Thompson*, the Court's rationale cannot be extended to invalidate a life sentence imposed on an adult convicted of first-degree murder. By finding a defendant such as Neely GBMI and therefore rejecting that defendant's insanity defense, the jury finds that she understood the consequences of her conduct, knew

her conduct was wrong, and could have prevented herself from committing the offense. *See* N.M. Stat. Ann. § 31-9-3(A) (defining "mentally ill").

The New Mexico legislature has imposed a mandatory minimum life sentence on all defendants found guilty of a capital felony,[12] including those defendants found GBMI of such felonies. *See id.* §§ 31-9-3(A), 31-18-14(A); *Neely II*, 876 P.2d at 223 (holding sentencing court does not have discretion to modify a mentally ill defendant's mandatory life sentence). As this court has previously recognized, "the responsibility for fixing prison terms is properly within the province of legislatures, not courts." *Scrivner v. Tansy*, 68 F.3d 1234, 1240 (10th Cir. 1995). This court cannot say the imposition of a life sentence upon a defendant found GBMI of first-degree murder offends the constitutional prohibition against cruel and unusual punishment. *See, e.g.*, *People v. Gindorf*, 512 N.E.2d 770, 780-81 (Ill. App. Ct. 1987) (rejecting mentally ill defendant's Eighth Amendment challenge to life sentence); *cf. Baker*, 931 F.2d at 1395 ("[W]e know of no cases . . . that forbid the mandatory imposition of a life prison sentence.").

Neely next argues that New Mexico's GBMI statute violates the Eighth Amendment because it does not serve the social purpose of deterrence.

---

[12]Defendants convicted of a capital felony may also be sentenced to death. *See* N.M. Stat. Ann. § 31-18-14(A).

According to Neely, mentally ill defendants are not likely to "weigh the prolix distinctions and consequences of ultimately being found mentally ill as opposed to being found insane." To the contrary, the GBMI verdict reflects the "jury's determination that the defendant was criminally responsible [and] [d]espite her illness, . . . appreciated the wrongfulness of her actions and possessed the ability to conform her conduct to the law; thus deterrence is an appropriate consideration." *Neely I*, 819 P.2d at 256.

Neely also argues that "[b]y holding that the GBMI statute leaves any treatment of guilty but mentally ill inmates to the unfettered discretion of prison authorities, the [*Neely I* court] essentially construed it to excuse those authorities from their constitutional duty to provide minimally adequate medical care to such inmates." The GBMI statute provides that if a mentally ill defendant is incarcerated, the corrections department is required to "examine the nature, extent, continuance and treatment of the defendant's mental illness and . . . provide psychiatric, psychological and other counseling and treatment for the defendant as it deems necessary." N.M. Stat. Ann. § 31-9-4. Although the statute leaves the treatment of incarcerated mentally ill defendants to the discretion of the corrections department, that discretion is not unfettered. The Supreme Court has held the states have an obligation to provide medical care to inmates. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). If the state fails in its duty to

provide such medical care, the inmate may bring a separate suit to compel treatment.[13] *See id.*; *Weismiller*, 815 F.2d at 1111; *Neely I*, 819 P.2d at 256 n.11. The department's discretion is therefore subject to an independent judicial check.

Finally, Neely asserts that in light of her history of mental illness and the jury's conclusion that she was mentally ill, her Eighth Amendment rights have been violated because she has not been allowed to serve her sentence in a mental facility. As the federal district court noted, however, Neely "does not contend that she has been denied appropriate medical treatment or that the Corrections Department is unwilling or unable to provide such treatment as she requires." There is no evidence in the record concerning Neely's current mental state or her current treatment program. "In order to state a cognizable [Eighth Amendment] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Gamble*, 429 U.S. at 106. Neely has made no such allegation. *Cf. Baker*, 440 N.W.2d at 289-90 (rejecting defendant's argument that GBMI verdict violated his Eighth Amendment rights because record did not reflect that he needed or was denied treatment).

The jury's finding of mental illness also does not support Neely's argument that she must be allowed to serve her sentence in a mental facility. By

---

[13]Failure to provide medical care does not, however, render the defendant's conviction invalid. *See, e.g.*, *People v. Tenbrink*, 287 N.W.2d 223, 225 (Mich. Ct. App. 1979).

finding Neely GBMI, the jury made a factual determination that she was mentally ill, but not insane, at the time of the commission of her offense. Mental illness is not a static condition. A person who was mentally ill at the time she committed an offense may not require treatment at the later date of incarceration. *See Weismiller*, 815 F.2d at 1111. Furthermore, the jury is not capable of making a clinical determination of a defendant's need for psychiatric treatment. The GBMI verdict, while signaling that Neely should be further evaluated, does not necessarily mean she was in need of treatment at the time of her sentencing. This court therefore rejects Neely's argument that her Eighth Amendment rights have been violated because she has not been allowed to serve her sentence in a mental facility.

**D.     Jury Voir Dire and Jury Instructions**

Neely's final argument is that the trial court's restriction of voir dire and its refusal to instruct the jury on the consequences of the NGRI and GBMI verdicts deprived her of due process and a fair trial.

This court's review of the state trial court's voir dire is "limited to enforcing the commands of the United States Constitution." *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991). In conducting this review, we are deferential to the trial court's determination of what questions should be asked. *See id.* at 424. "To be constitutionally compelled, . . . it is not enough that such questions might be

helpful.  Rather, the trial court's failure to ask [tendered] questions must render the defendant's trial fundamentally unfair." *Id.* at 425-26.

Neely sought to question the venire panel about their understanding of the consequences of the NGRI and GBMI verdicts.[14]  The trial court denied her request on the grounds that in a non-death penalty case, the jury is not to consider the consequences of its verdict.  The court did, however, allow Neely to inquire generally into the panel's feelings about the insanity defense and whether they had the ability to find her NGRI if the facts so warranted.  In response to Neely's questions, one prospective juror called the NGRI defense a "cop-out" that "put[s] people right back out [on the streets] again."  Several others expressed concern about whether the defense should excuse a criminal act.  Another asked what would happen if Neely was found "guilty with the insanity plea."  The court

---

[14]When asked specifically what questions he intended to ask during voir dire, the following exchange occurred between Neely's counsel, Mr. Bustamante, and the trial judge:

> Mr. Bustamante:  Well, Judge, just asking them if they have any fear about it, first of all.  If they have any fear about finding Ms. Neely not guilty by reason of insanity.  Ask them why you have that feeling.  That would be the starting point.
>
> The Court:  Don't you think a more appropriate question might be if the facts show that she was insane at the time, could you follow the instructions and find her not guilty by reason of insanity?
>
> Mr. Bustamante:  That would be a proper question.  Judge, I think a follow-up question would be, if showed that and you think you could fairly follow the evidence and if you thought that she could walk out the door.  I mean that is the problem.

responded that "the jury can't concern themselves with the consequences as to what punishment might be." Although all these prospective jurors were ultimately excused, Neely argues the trial court's failure to correct their misconceptions or explain the consequences of the insanity verdict violated her constitutional rights.

Neely's contentions must be considered in light of the underlying purposes of voir dire: to seat an impartial jury and to facilitate the appropriate exercise of peremptory challenges. *See id.* at 431. "'[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.'" *Id.* at 422 (alteration in original) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)).

In *Lujan v. Tansy*, 2 F.3d 1031 (10th Cir. 1993), this court rejected an argument similar to that advanced by Neely. In that case, the defendant argued the trial judge's failure to instruct the jury about the consequences of the NGRI verdict "was particularly egregious because a prospective juror, later removed from the panel, expressed concern in front of the entire venire during voir dire that if [the defendant] were found not guilty by reason of insanity, he would be released, posing great danger to the community." *Id.* at 1037 n.5. In response to the comment, the trial judge stated that what happened to the defendant was

"'none of [the jury's] business.'" *Id.* The court concluded that the "incident does not . . . elevate the alleged instructional error to one of constitutional dimension." *Id.*

Although Neely was not allowed to question the venire panel about their understanding of the consequences of the NGRI and GBMI verdicts, she was given latitude in questioning the panel about their beliefs regarding the insanity defense. She therefore had the opportunity to discover any biases on the part of the potential jurors concerning the insanity defense which could affect their deliberations. In light of *Lujan* and the purposes of voir dire, Neely has not met her burden of showing her trial was rendered fundamentally unfair by the trial court's refusal to allow her to question the venire panel about their understanding of the NGRI and GBMI verdicts. *See id.* at 1037 & n.5; *see also State v. Poindexter*, 431 S.E.2d 254, 255 & n.2 (S.C. 1993) (holding that purposes of voir dire do not require that venire panel be informed of consequences of NGRI and GBMI verdicts).

Neely also argues the trial court's refusal to instruct the jury on the consequences of the NGRI and GBMI verdicts violated her constitutional rights. A habeas defendant challenging a state court judgment based on an erroneous jury instruction bears a difficult burden. *See Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995). To prevail, Neely must establish the allegedly erroneous instruction

rendered her trial fundamentally unfair. *See id.* It is not sufficient to show that "'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). Rather, Neely must establish the instruction "'so infected the entire trial that [her] resulting conviction violates due process.'" *Id.* (quoting *Naughten*, 414 U.S. at 147). Moreover, Neely's burden is weighted further because her challenge is premised on the failure to give an instruction rather than the rendering of an erroneous one. *See id.* at 155.

The *Neely I* court held that state law did not entitle Neely to an instruction on the consequences of the NGRI and GBMI verdicts. *See* 819 P.2d at 256. According to the court, an instruction on the consequences of the verdicts "would present an irrelevant issue to the jury." *Id.* That holding is consistent with the Supreme Court's recent opinion in *Shannon v. United States*, 512 U.S. 573 (1994). In *Shannon*, the Court held that a federal district court is not required to instruct the jury on the consequences of a NGRI verdict. *See id.* at 575. In reaching its conclusion, the Court noted the well-established principle that "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Id.* at 579 (footnote omitted) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).

Neely distinguishes *Shannon* by arguing the jury in her case served a sentencing function. Because one of the asserted purposes of the GBMI verdict is to identify those defendants in need of treatment, Neely argues the jury played a role in sentencing. As discussed above, however, the jury need not be informed of the consequences of the GBMI verdict in order for the verdict to have the intended effect of identifying those defendants in need of further evaluation.

Neely further argues that "[i]n a first-degree felony case, where a life sentence in prison is mandatory, the jury's verdict . . . determines the sentence." Under Neely's reasoning, any jury whose verdict leads to a mandatory sentence would be considered to serve a sentencing function. As *Shannon* recognized, however, "jurors [generally] are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense." *Id.* at 586-87; *see also United States v. Parrish*, 925 F.2d 1293, 1299 (10th Cir. 1991) (holding jury instruction about mandatory minimum sentences was properly omitted).

"The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged." *Shannon*, 512 U.S. at 579. In this case, the jury made a factual finding that Neely was GBMI of first-degree murder. The New Mexico legislature, not the jury, determined the appropriate sentence. We therefore reject Neely's argument that the jury in her case served a

-26-

sentencing function and thus should have been instructed on the consequences of the possible verdicts.

Neely also argues that a jury instruction regarding the consequences of the GBMI and NGRI verdicts was necessary to correct jurors' misconceptions about the verdicts. The Court in *Shannon* specifically rejected this argument. *See id.* at 584-87. Like the jurors in this case, the jurors in *Shannon* were not told the consequences of a NGRI verdict but were rather instructed to disregard the consequences of their verdict. *See id.* at 585. The Court concluded that although it may be difficult for jurors to set aside the potential consequences of their verdict, jurors are presumed to follow their instructions. *See id.*; *see also United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998) ("A central assumption of our jurisprudence is that juries follow the instructions they receive.").

As previously indicated, Neely bears an especially heavy burden in challenging her conviction based on the trial court's refusal to instruct the jury on the consequences of the NGRI and GBMI verdicts. She must show the omission rendered her trial so fundamentally unfair as to deny her a fair trial and due process of law. She has failed to do so. *See Lujan*, 2 F.3d at 1037 (rejecting defendant's habeas claim that he was denied due process because of trial court's refusal to instruct on consequences of NGRI verdict); *see also Poindexter*, 431

S.E.2d at 255 (holding jury need not be informed of consequences of NGRI and GBMI verdicts).

## III.  CONCLUSION

Neely's request for a certificate of appealability, construed as a request for a certificate of probable cause, is **GRANTED**.  The district court's denial of her petition for a writ of habeas corpus is **AFFIRMED**.