**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 16 2002**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

LARRY KENNETH JACKSON,

      Petitioner - Appellant,

v.

MIKE MULLIN, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellee.

No. 01-6131
(D.C. No. CIV-99-539-M)
(W.D. Oklahoma)

**ORDER AND JUDGMENT** *

Before **EBEL** , Circuit Judge, **BRORBY** , Senior Circuit Judge, and **MURPHY** , Circuit Judge.

      Larry Kenneth Jackson was convicted by an Oklahoma trial court of the first degree murder of his girlfriend Wendy Cade and sentenced to death. The Oklahoma Court of Criminal Appeals (OCCA) affirmed the conviction and sentence. *Jackson v. State*, 964 P.2d 875 (Okla. Crim. App. 1998) (per curiam), *cert. denied*, 526 U.S. 1008 (1999). That court also denied post-conviction relief.

---

\*    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

*Jackson v. State*, No. PC-97-1349 (Okla. Crim. App. Nov. 20, 1998). Thereafter, Jackson filed a federal habeas petition, and the federal district court denied relief.

That court granted a certificate of appealability (COA) on one issue: whether the trial court's refusal to instruct on the defenses of voluntary and involuntary intoxication violated Jackson's constitutional rights. At a case management conference, this court granted a COA on an additional issue: whether the trial court's refusal to allow voir dire concerning the prospective jurors' attitudes toward intoxication defenses violated Jackson's constitutional rights. Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c), we affirm the denial of habeas relief on both issues.

**FACTS**

Cade died in a room at the Oklahoma City Motel 6 on September 6, 1994, due to a laceration to her neck that severed her jugular veins. It is undisputed that Jackson, an inmate at the Joseph Harp Correctional Center, killed her.

Jackson and Cade had maintained a relationship while Jackson was incarcerated. She visited him at the prison on Sundays, and at least twice outside the prison when he was with a prison work crew. Jackson believed they would marry after his release, but Cade was engaged to and living with Victor Dizer, the father of some of her children, and was attempting to change her relationship with

-2-

Jackson. Apparently, Jackson and Cade had ongoing arguments about this relationship change.

On September 6, Jackson was assigned to a work crew delivering and installing office/modular furniture at the Jim Thorpe state office building in Oklahoma City. That day, Cade also went to the building, and the two left in her Jeep. Sometime before going to the motel, Jackson purchased a quart of beer at a convenience store. At the same time, Cade went to a nearby liquor store and purchased a fifth of liquor called Alize, which was a mixed drink of passion fruit juice and cognac. Jackson drank all of the Alize and half of the quart of beer and had two puffs on a marijuana cigarette before entering the motel room. While in the room, the two had sexual intercourse and fought. Jackson claimed he "blimped out." He remembered leaving the motel in Cade's Jeep, having an accident and abandoning the Jeep. Later that day, a highway patrol trooper found the Jeep.

After abandoning the Jeep, Jackson next remembered waking up in a field and walking until he met two men. He obtained a ride from them to the apartments where his sister worked. He arrived about 6:00 or 6:30 p.m. Dorothy Leffette, the sister of one of the men, let him stay with her until morning.

On September 7, Dizer and Martha Gulley, Cade's mother, went to the area where the Jeep was found. Noticing the nearby Motel 6, they went there and

learned Cade had rented a room. After being notified, the police checked the room and found Cade's body lying against the bed. She had sustained over thirty cuts. The entire bathroom floor, apart from the shower, was covered with blood. It appeared a struggle had occurred in the bathroom, and Cade had been moved from the bathroom to the bedroom. There was some blood on the bedroom carpet, but little blood on Cade's nude body. The police found a box cutting knife wrapped in a wash cloth and stuck between the mattress and box springs of the bed.

The police located Jackson at Leffette's apartment. In the room where the police arrested Jackson, they found Cade's jewelry, watch, and keys to her Jeep. Jackson admitted to police officers that if Cade was dead, he did it, but he did not intend to kill her, did not want to talk about the details of the killing, and did not remember much about what happened in the motel room.

At trial, Jackson's defense was that he killed Cade without malice aforethought because he had blacked out due to intoxication and being upset. Rejecting the lesser included offense of manslaughter, the jury found Jackson guilty of first degree murder.

**STANDARDS OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), if a claim is adjudicated on the merits in state court, a petitioner

is entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The AEDPA also requires federal courts to presume state court factual findings are correct and places the burden on the petitioner to rebut that presumption by clear and convincing evidence. *Id.* § 2254(e)(1). If a state court did not decide a claim on its merits, this court reviews the district court's legal conclusions *de novo* and its factual findings, if any, for clear error. *McCracken v. Gibson*, 268 F.3d 970, 975 (10th Cir. 2001), *petition for cert filed*, (U.S. May 17, 2002) (No. 01-10302).

**ANALYSIS**

**I. Failure to Instruct on Voluntary and Involuntary Intoxication**

Jackson argues the trial court denied him due process and his Sixth, Eighth, and Fourteenth Amendment rights by refusing to instruct the jury, as he requested, on voluntary and involuntary intoxication. He claims the jury instructions did not reflect his intoxication defense, despite his offering ample evidence to support the defense.

Jackson fails to cite Supreme Court precedent establishing a constitutional mandate for intoxication instructions. [1] Supreme Court precedent instead suggests there is no such mandate. *See generally Montana v. Egelhoff*, 518 U.S. 37, 39-40, 43, 51, 56 (1996) (holding Montana statute precluding consideration of voluntary intoxication in determining existence of mental state which is element of criminal offense does not violate Due Process Clause); *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002) (citing *Egelhoff* for proposition that states have great latitude in formulating defenses to crimes), *petition for cert. filed,* (U.S. Aug. 28, 2002) (No. 02-6153).

The alleged error in jury instructions is reviewable, therefore, in the context of the entire trial, only for the denial of fundamental fairness and due process. *See Henderson v. Kibbe*, 431 U.S. 145, 156-57 (1977) (pre-AEDPA); *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999) (same); *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999) (same); *see also Kentucky v. Whorton*, 441 U.S. 786, 789-90 (1979) (per curiam) (reviewing totality of circumstances to decide if

---

[1] To support an intoxication instruction, Jackson cites *Mathews v. United States*, 485 U.S. 58, 63 (1988), which held that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." The decision in *Mathews*, however, was not based on the Constitution or federal habeas corpus principles. Rather, it was based on federal common law and rules and the Supreme Court's supervisory power over direct appeals. We therefore conclude the holding in *Mathews* does not control this habeas case.

defendant received constitutionally fair trial where presumption of innocence instruction was not given). "[T]he burden on a petitioner attacking a state court judgment based on a refusal to give a requested jury instruction is especially great because '"[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of law."'" *Tyler*, 163 F.3d at 1227 (quoting *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) (quoting *Henderson*, 431 U.S. at 155)). As a predicate to deciding whether the trial court's refusal to instruct on intoxication violated Jackson's constitutional rights by rendering his trial fundamentally unfair, this court can examine relevant Oklahoma law.[2]

In Oklahoma, juries may consider voluntary intoxication to determine if a defendant had the intent to commit first degree murder. *See Bland v. State*, 4 P.3d 702, 715 (Okla. Crim. App. 2000), *cert. denied*, 531 U.S. 1099 (2001); *Fitzgerald v. State*, 972 P.2d 1157, 1174 (Okla. Crim. App. 1998); *Lamb v. State*, 767 P.2d 887, 889-90 (Okla. Crim. App. 1988). The OCCA, in *Jackson*, 964 P.2d at 891-92, clarified Oklahoma law concerning presentation of an intoxication defense. That court noted that the trial judge first had a duty to decide whether

---

[2]     This court does not "reexamine state-court determinations on state-law questions;" rather, this court "is limited to deciding whether [Jackson's] conviction violated the Constitution, laws or treaties of the United States." *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also King v. Champion*, 55 F.3d 522, 527 (10th Cir. 1995) ("This court may not correct errors of state law made by state courts.").

the defense was adequately raised such that it warranted instruction. *Id.* at 891.

"When sufficient, *prima facia* evidence is presented which meets the legal criteria for the defense of voluntary intoxication, or any other defense, an instruction should be given." *Id.* at 892. "A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." *Id.*; *see also Frederick v. State*, 37 P.3d 908, 942 (Okla. Crim. App. 2001) (holding mere consumption of alcohol and marijuana is insufficient to raise voluntary intoxication defense without showing consumption prevented defendant from forming premeditated intent); *Bland*, 4 P.3d at 718 (upholding trial court's refusal to give voluntary intoxication instruction because defendant gave detailed account of circumstances surrounding crime).

Applying these standards, the OCCA found that Jackson failed to present sufficient, *prima facie* evidence to support giving a voluntary intoxication instruction:

> We find that Jackson has failed to present evidence that his mental powers were so overcome through intoxication that he could not form the specific intent to kill. Expert testimony revealed that if a person consumed as much alcohol as Jackson claimed to have consumed, he would be in a stupor with markedly diminished awareness of things going on around him and have diminished ability to focus attention and would have severely impaired motor

functioning. However, Jackson's testimony revealed that he did not suffer from these conditions.

Jackson testified that he was aware of things going on around him just before and just after the murder. Jackson told Dr. Donica that he and Cade were physically fighting in the motel room, they interrupted their fighting long enough to make up and have sex, then they began hitting each other again. Jackson said he went into the bathroom to put on his clothes and Cade came in and started hitting him, they both fell to the floor, they both got up, continuing to hit each other, then Cade fell to the floor. He left the bathroom and sat on the bed, when he went back into the bathroom he saw Cade laying on the floor with blood on her. He told [Dr.] Donica that he was frightened so he got his clothes on and left. This testimony belied Jackson's defense that he was so intoxicated he could not form the requisite intent to kill.

*Jackson*, 964 P.2d at 892.[3]

In light of the high standards imposed by AEDPA, we conclude that the failure to give a voluntary intoxication instruction did not render Jackson's trial fundamentally unfair. The only evidence in this case supporting a voluntary intoxication defense is the various statements of Jackson. Jackson's statements,

_____

[3]      Jackson submits the OCCA's disbelief of his defense caused the court to engage in review held erroneous in *Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999). *Hogan*, however, is distinguishable. In that case, the OCCA determined a lesser included offense instruction was unnecessary because sufficient evidence supported the malice murder conviction. *Id.* at 1305. This court held that determination did not satisfy the requirements of *Beck v. Alabama*, 447 U.S. 625, 627 (1980), which requires a court instead to decide whether the defendant presented sufficient evidence to warrant giving a lesser included offense instruction. *Hogan*, 197 F.3d at 1305-06. Unlike in *Hogan*, the OCCA in this case did assess whether Jackson presented sufficient evidence to warrant intoxication instructions. *See Jackson*, 964 P.2d at 892.

however, were conflicting. During his September 7, 1994, interview with police detectives, Jackson did not indicate he was too intoxicated to remember the killing. Although he mentioned drinking in passing, he stressed that he was angry, on edge and had "blimped out." On September 16, 1994, Jackson told an Oklahoma Department of Corrections' internal affairs investigator that he had one beer and smoked marijuana and felt "messed up" from them. On June 24, 1995, Jackson told Dr. Donica about drinking half a quart of 3.2 beer and taking two puffs from a marijuana cigarette. According to Dr. Donica, this small amount of beer would have decreased Jackson's inhibitions against aggressiveness, mildly impaired his intellectual functioning, and mildly to moderately diminished his awareness of what he was doing and what was happening. Dr. Donica, however, did not say Jackson was intoxicated.

Only later did Jackson indicate he was intoxicated. Fourteen months after the crime, Jackson remembered consuming the Alize. On November 27, 1995, Jackson, for the first time, mentioned to Dr. Donica that he drank the bottle of liquor. From this new information, Dr. Donica estimated Jackson's blood alcohol to have been 0.20 from 11 a.m. to 12:30 p.m., 0.19 at 3 p.m., and 0.12-0.13 at 6:30 p.m. With a blood alcohol of 0.20 or higher, Dr. Donica stated a person may be in an alcoholic stupor with markedly diminished awareness of anything going on around him and severely impaired motor functioning. At trial, Jackson

-10-

testified that although he was not sure, he guessed he was drunk and could not remember the killing both because he was upset and under the influence of intoxicating alcohol. Leffette, who first saw Jackson about 6:00 or 6:30 p.m. on the day of the murder, testified that he was acting fine, did not smell of alcohol and did not appear intoxicated or under the influence of drugs.

As the OCCA determined, the evidence did not suggest Jackson was in such an alcoholic stupor. All of the evidence established that Jackson did consistently remember after drinking where he went, getting into a fight with Cade, grabbing her around the neck, leaving the motel, waking up in the field, asking for a ride, and telling the driver where he wanted to go. Further, Jackson specifically remembered that while they were in the motel room, Cade ate the chicken she bought at a fast food restaurant; they had sex; they talked about their relationship; she got more aggressive as they talked; she followed him into the bathroom raving, hollering, screaming, kicking and striking him; he hit her to contain her; and he grabbed her and pulled her towards him after she came into the bathroom. Thus, Jackson remembered the details of the events before and after the murder, suggesting he had control of his mental faculties, had coherent decision-making ability, and was not in a state of intoxication such that his judgment was impaired.

-11-

Jackson asserts the OCCA's dissent correctly decided this case. The dissent criticized the majority for (1) failing to find sufficient evidence to support a *prima facie* case of intoxication; (2) weighing the evidence; and (3) using an incorrect test by reciting that Jackson had not proved his defense beyond a reasonable doubt. *Jackson*, 964 P.2d at 902-03 (Lane, J., dissenting).

The first criticism is addressed by the prior discussion. Contrary to the dissent's assertion, the majority did not weigh the evidence. *See id.* at 892 (recognizing trial court should not weigh evidence). Nor did the majority require Jackson to prove his defense beyond a reasonable doubt to obtain instructions on that defense. While the majority noted that recent Oklahoma law required a defendant to raise a reasonable doubt about his ability to form requisite criminal intent, the majority further expressed concern that the test was too stringent. *Id.* at 891-92. The majority therefore clarified that if there was sufficient, *prima facie* evidence presented, which met the legal criteria for voluntary intoxication, then the trial court must give a voluntary intoxication instruction. *Id.* at 892.

Before this court, Jackson argues in only very general terms that he was also entitled to instructions on involuntary intoxication. Neither the OCCA nor the federal district court specifically addressed the issue. Involuntary intoxication is a complete defense if the defendant is so intoxicated he cannot distinguish

between right and wrong. *Jones v. State*, 648 P.2d 1251, 1258 (Okla. Crim. App. 1982). "Involuntary intoxication results from fraud, trickery or duress of another, accident or mistake on defendant's part, pathological condition or ignorance as to effects of prescribed medication." *Patton v. State*, 973 P.2d 270, 290 (Okla. Crim. App. 1998). No evidence in this case supported giving an involuntary intoxication instruction. Jackson himself testified he assumed the Alize contained alcohol because it came from a liquor store.

Given the context of this case, the trial court's failure to instruct on intoxication did not rise to the level of error rendering the trial fundamentally unfair. *See Maes*, 46 F.3d at 985. Accordingly, the OCCA's decision was not unreasonable. *See* 28 U.S.C. § 2254(d).

## II. Voir Dire

Jackson argues the voir dire process precluded him from seating a fair and impartial jury because he did not have an opportunity to ask about any bias and hostility toward his diminished capacity/voluntary intoxication defense and he could not determine which jurors to remove with peremptory challenges. He, therefore, asserts the trial court denied him his constitutional right to be tried in a fundamentally fair proceeding.

Our resolution of the first issue dictates the outcome of this issue. Nonetheless, upon consideration of the merits, we further conclude the OCCA's

decision that the voir dire was constitutionally proper was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See id.* § 2254(d)(1).

"This court's review of the state trial court's voir dire is 'limited to enforcing the commands of the United States Constitution.'" *Neely v. Newton*, 149 F.3d 1074, 1083-84 (10th Cir. 1998) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991)) (pre-AEDPA); *see also Sallahdin v. Gibson*, 275 F.3d 1211, 1222 (10th Cir. 2002). The underlying purposes of voir dire are to pick an impartial jury and to assist counsel's exercise of peremptory challenges. *Mu'Min*, 500 U.S. at 431. Thus, inquiry is permitted to determine if prospective jurors have any bias, opinion or prejudice that would affect fair determination of the trial issues. *Neely*, 149 F.3d at 1084 (citing *Mu'Min*, 500 U.S. at 422).

"[T]he trial court[, however,] retains great latitude in deciding what questions should be asked on *voir dire*." *Mu'Min*, 500 U.S. at 424; *see also Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (plurality). "To be constitutionally compelled, . . . it is not enough that [certain] questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 425-26; *see also Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976) ("The Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed

-14-

to matters that conceivably might prejudice veniremen against him. . . . Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant.") (footnote omitted).

Addressing whether the trial court allowed Jackson "sufficient voir dire to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise his peremptory challenges," the OCCA determined:

> [T]he trial court did not abuse its discretion in disallowing Jackson's questions regarding his theory of defense. The questions were an effort to test jurors' willingness to accept his theory of defense rather than to test their impartiality. Ultimately, instructions on voluntary intoxication were not given. Therefore, defense counsel's proposed questions would only have confused the jury.

*Jackson* , 964 P.2d at 883.

This determination was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Although the trial court refused to allow Jackson to question the venire panel about his specific defense or its underlying facts, the trial judge did give him latitude to ask the panel whether they would believe the testimony of psychologists or psychiatrists. And Jackson's counsel did ask the prospective jurors whether they would give credit or weight to psychology and psychiatry experts and whether they would follow the instructions. Jackson, therefore, did have an opportunity to ascertain bias or prejudice on the part of the prospective

-15-

jurors.  *Cf. Sellers v. Ward*, 135 F.3d 1333, 1341-42 (10th Cir. 1998) (upholding trial court's refusal to allow defendant to ask prospective jurors if they would find specific facts mitigating);  *McQueen v. Scroggy*, 99 F.3d 1302, 1328-29 (6th Cir. 1996) (upholding trial court's refusal to allow specific question concerning intoxication as mitigating evidence because it implicated legal standard and when counsel was able to ask other questions concerning juror's attitudes concerning alcohol).  Further, the permitted questioning was sufficient to allow Jackson to exercise intelligently his peremptory challenges.

Even assuming additional questions may have been helpful, in light of the high standards set by the Supreme Court cases and the great amount of deference given to trial courts, Jackson has not met his burden of showing the trial court unconstitutionally restricted his voir dire by refusing to allow him to question the prospective jurors about intoxication, thereby rendering his trial fundamentally unfair.  *See Mu'Min*, 500 U.S. at 425-26;  *Neely*, 149 F.3d at 1084.  Accordingly, the OCCA's determination was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED.

Entered for the Court


Michael R. Murphy
Circuit Judge