964 So.2d 911 (2007)
STATE of Louisiana
v.
Shon D. MILLER, Sr.
No. 2005-KA-1826.
Supreme Court of Louisiana.
June 29, 2007.
Capital Appeals Project, Jelpi Pierre Picou, Jr., William Martin Sothern, Aneel Lachman Chablani, for appellant.
Charles C. Foti, Jr., Attorney General, Anthony Gerard Falterman, District Attorney, Donald David Candell, Robin Catherine O'Bannon, Assistant District Attorneys, for appellee.
WEIMER, Justice.
This direct appeal was taken following conviction of the defendant on four counts of murder and a jury's return of a sentence of death on all four counts.
Finding the trial court's pre-trial rulings preventing defendant from the exercise of his right to plead not guilty by reason of insanity resulted in a constitutionally flawed jury trial, we reverse the convictions and sentences and remand for a new trial. In light of the language, legislative intent, and purpose of LSA-C.Cr.P. art. 561 and the jurisprudence consistently applying *912 this article, a defendant shows "good cause" for changing a plea from "not guilty" to "not guilty and not guilty by reason of insanity" when the change is not made dilatorily to secure a strategical advantage, is not made frivolously, and is supported by indicia of insanity.

PROCEDURAL BACKGROUND
On April 15, 1999, a grand jury of the Twenty-Third Judicial District returned an indictment of defendant, Shon Miller, Sr., charging four counts of first degree murder in violation of LSA-R.S. 14:30[1] for the deaths of Carla Miller (his estranged wife); Shon Miller, Jr. (his infant son); Mildred Vessel (his mother-in-law); and Vanario[2] Jackson. On June 12, 2000, after a trial by jury, defendant was found guilty as charged on all four counts. At the conclusion of the penalty phase of the trial, the jury unanimously voted for a sentence of death, finding the aggravating circumstances that defendant created a risk of death or great bodily injury to more than one person and that the victim was under the age of 12 on the count relating to his infant son.

FACTUAL BACKGROUND
On March 10, 1999, under the guise of retrieving an income tax refund check from his estranged wife, Miller procured a ride from Belle Rose to Gonzales with his friend, Carl Bennett, in a car driven by Ellis Clark. As the three men were crossing the Sunshine Bridge, Clark noticed that Miller had a gun on the seat of the car. The trio's first stop, at Miller's direction, was at the home of his mother-in-law, Mildred Vessel, who was just pulling into the driveway in a van. Defendant exited Clark's car, walked to the Vessel vehicle, and fired several shots, killing his mother-in-law.
With threats of violence to Clark, defendant ordered him to drive to the New St. John Fellowship Church so he could find his wife. Although Clark and Bennett were able to enter the church ahead of Miller, planning to alert its occupants to defendant's presence and call the authorities, defendant soon followed. While a second phone call to authorities was being made, gunfire erupted in the church. During the fray, as many as 16 shots were fired resulting in three people being killed and several others being wounded.
Autopsies on the victims showed that Vanario Jackson, the man who had been seated next to defendant's wife and son in church, was killed by a single gunshot wound to the head; the other three victims sustained multiple gunshot wounds.
Defendant fled the scene on foot, and police later located him hiding inside a shed. When negotiation for the armed defendant's surrender was unsuccessful, the Ascension Parish Sheriff's Office Crisis Response Team ultimately disarmed defendant by shooting the weapon out of his *913 hands. However, when an officer entered the shed to effectuate the arrest, he tripped on some debris and accidentally discharged his weapon. The gunshot struck defendant in the back and ultimately left him paralyzed from the waist down.

PRE-TRIAL PROCEEDINGS
Defendant's first and most strenuously urged argument concerns the trial court's refusal to allow him to withdraw his initial "not guilty" plea and amend it to include "not guilty by reason of insanity." Defendant maintains that, considering the evidence put forth concerning his mental health and the State's failure to make any showing that he sought to amend the plea for dilatory purposes, the court's ruling denied him due process of law and requires reversal of his convictions.[3]
The record reveals that at the arraignment on May 17, 1999, defendant, represented by court-appointed counsel, entered a plea of not guilty. Some three months later, on August 23, 1999, defendant filed a motion entitled, "APPLICATION FOR APPOINTMENT OF SANITY COMMISSION TO EXAMINE DEFENDANT AND TO REPORT ON HIS PRESENT MENTAL CONDITION AND MENTAL CONDITION AT THE TIME OF THE ALLEGED OFFENSE AND FOR HEARING AS TO HIS PRESENT CAPACITY TO PROCEED." In the written motion, defendant requested that he be allowed to withdraw the not guilty plea and enter a dual plea of not guilty and not guilty by reason of insanity.
The court held its first hearing on the issue on November 10, 1999, at which defendant's adoptive mother,[4] Ethel Carter, testified in support of the motion.
Carter testified that she adopted defendant and his three siblings after his biological mother, her next-door neighbor, died of cancer when defendant was two and one-half or three years old. After the death, defendant stopped talking for approximately six months. She continued that defendant did not play with other children but preferred to do things by himself. She testified defendant maintained good grades in school, but Carter sought psychiatric treatment for him at the Donaldsonville Mental Health Clinic. Defendant received treatment at the clinic for four or five years, from the age of about nine until he was thirteen or fourteen years old. Carter denied that defendant had been prescribed medication. Defendant presented behavior problems when told what to do by adults. After defendant married, Carter claimed the couple "got along pretty good," but that "[t]hey fought a lot."
Carter maintained that defendant had attempted suicide three times. As to the circumstances of the attempts, however, the court sustained the State's hearsay objections. Carter stated that defendant had just been released from jail when someone observed him stalking his wife in *914 the park and that as a result, he was placed in Meadow Wood Hospital for three nights. According to Carter, on the day of the shootings defendant's demeanor appeared normal. Finally, she testified that defendant did not own any weapons, nor had he had any problems with drugs or alcohol.
On cross, Carter stated that to her knowledge, defendant had not attempted suicide before he married. She also acknowledged receipt of a letter he had sent to her indicating that "if Carla didn't take him back he was going to kill himself."
At the close of the hearing on defendant's motion, during redirect, counsel attempted to introduce defendant's mental health records, arguing that:
[t]he purpose of this hearing is not to determine at this particular point in time whether he knew the difference between right and wrong. The purpose at this time is to present a prima facia case showing that the man did have problems. We are introducing evidence that he has had mental health problems from the age of nine or 10 years old, all the way through his adult life. We're showing that he had problems. We're showing that he had a history of mental problems, mental health. And all of this accumulated, and by the mere fact that this incident is supposed to have happened in the church, and also the victims are supposed to be the wife and two-year-old son, I think all of these incidences taken together as a whole, would indicate that everything is not right with the defendant.
The State maintained that the defense failed to make a substantive showing of defendant's insanity, arguing:
There's no indication of any mental disease or defect that he was suffering from and no evidence was put on by the defense that there was any mental disease or defect. This particular defendant doesn't get his way, he does whatever he has to do to accomplish what he wants done. And he takes it to the extreme. All he is a desperate little coward, but that doesn't make him crazy at the time of the offense.
Without ruling on the admissibility of the mental health records, the court agreed with the State's rationale and denied the request to change the plea, ruling as follows:
The Court finds that the defense has woefully failed in showing any indication for the appointment of any type of lunacy commission for the purposes of determining whether this particular defendant knew the difference between right and wrong. There was no evidence to support or to give this Court any grounds to allow this defendant to change his plea from not guilty to not guilty by reason of insanity.
The defense then made a request for the appointment of an independent psychologist to examine defendant on the issue of sanity which the court denied, stating: "I've ruled on that, that I'm not allowing him to change his plea. But it's just moot at this point."
After the court denied the motion to change the plea to include an insanity defense, counsel expressly withdrew the motion as it related to the ability to assist counsel and to proceed toward trial.
Despite its earlier ruling, the court held a second hearing on the issues in response to the defense "MOTION TO APPOINT SANITY COMMISSION AND MOTION TO CHANGE PLEA" filed on May 12, 2000. At the hearing, on May 25, 2000, some six months after the initial hearing conducted in November 1999, the defense introduced the following evidence.
*915 Forensic social worker Patricia Percy testified that she interviewed defendant on two occasions, consulted with his family and psychiatrists, and reviewed his mental health records. Although Percy described limitations in her ability to make an accurate assessment as a result of defendant's failure to complete psychological tests, she prepared a report based on the interviews and the documentation given to her. However, regarding the substance of the defense motions, the court sustained the State's relevancy objection as a result of Percy's lack of expertise in making psychiatric diagnoses.[5]
The medical records from the Gonzales Mental Health Center revealed that when defendant was nine years old, he was diagnosed with separation anxiety disorder,[6] sleep terror disorder[7] and "from time to time exhibited strange physical behavior, such as rolling of the eyes, head and neck jerking, grunting sounds, running into walls as well as other unusual mannerisms." Some years later when defendant was 13, progress notes from the Gonzales Mental Health Center show that he was diagnosed as follows:
Axis I a) Conduct disorder, sol type, severe
b) dysthymia R/O
II R/O Dyslexia / Mixed sp[ecial] development disabilities
III R/O Static Encephalopathy[[8]] minimum brain dysfunct
IV Mild [Psychosocial and environmental problems]
V Poor [Global assessment of functioning][[9]]
These notes further indicate defendant was a 14-year old fifth grader who had been in counseling for significant behavioral problems.
Over eight years later on August 11, 1998 (eight months before the shootings), defendant attempted to commit suicide by swallowing fifty aspirin tablets and drinking a container of cleaning fluid.[10] Upon *916 his admission to the emergency room, defendant told medical personnel that "[h]is wife had threatened to leave him and that he would not be able to see her and the children."
Following an arrest for stalking his wife later in August of 1998, defendant was again admitted to the Gonzales Mental Health Clinic on October 22, 1998. Upon admission, his assessment revealed that defendant was "planning to commit suicide if he cannot resume [his] relationship [with his] spouse." Defendant was placed on suicide watch, prescribed Elavil, and ultimately released from the facility on November 19, 1998.
On December 7, 1998, defendant was involuntarily committed to Meadow Wood Hospital. In an integrated assessment conducted the following day, he was described as a danger to himself and others and in need of medical management for depressive illness and psychosis. Defendant was prescribed Desyrel (trazdone, an anti-depressant) and discharged on December 11, 1998.
Following the March 10, 1999 shootings, defendant was housed in the infirmary of the Dixon Correctional Institute. While on a standard suicide watch, defendant reported hallucinating on three consecutive days. He first reported hearing "four or five male voices" and that one of the voices "belongs to Satan." He next stated he had "visions of demons at night bouncing off the walls." Lastly he explained, "Last night I kept seeing someone come to the window. They looked like they were trying to kill me."
Psychologist Dr. Joel Abrams testified concerning defendant's capacity to proceed to trial.[11] Dr. Abrams examined defendant on March 24 and March 29, 2000, at the Hunt Correctional Institute. After meeting with defendant for approximately five hours over the two days, Dr. Abrams testified that "it became clear that [defendant] was having extraordinary difficulty putting forth a meaningful degree of effort to provide both his personal history, and to attend to the tasks at hand, that is the formal assessment instruments." He continued that the tests showed defendant was not malingering, but that "depression [was] interfering with . . . defendant's ability to put forth adequate effort." Following his discussion with psychiatrist, Dr. Sarah Deland, Dr. Abrams concluded that "[c]onsidering that the neuropsychological evaluation was a major aspect of the defense, and [defendant] could not fully engage in that process, it would make it very difficult to marshal his defense, at least from the neuropsychological perspective."
On cross, the State presented Dr. Abrams with records from Hunt Correctional Institute indicating that defendant had not exhibited typical symptoms of depression such as sleeplessness and poor appetite while incarcerated. Nevertheless, in his professional opinion Dr. Abrams did not believe defendant possessed the ability to assist counsel, although defendant may have believed himself competent.
Forensic psychiatrist Dr. Sarah Deland also attempted to evaluate defendant's mental health and capacity to proceed and testified at the hearing. In a letter to defense counsel dated April 26, 2000, attached as an exhibit to the motion to appoint sanity commission and to change plea, she described her limited findings as follows:
I have now interviewed Mr. Miller twice and reviewed records in his case. I have also spoken with Joel Abrams, *917 PhD regarding psychological testing performed on Shon Miller. During my last interview with the defendant on April 12, 2000, I became concerned with Mr. Miller's mental state. During both interviews, he appeared to be suffering from Major Depression, but now it seems to be worse. His symptoms are causing apathy and complete lack of concern for his future and well-being. He appears to be uninterested in assisting with efforts made on behalf of his defense to these very serious charges. It is my opinion, with reasonable medical certainty, that Mr. Miller is suffering from a mental illness that is impairing his ability to cooperate and assist with efforts being made on behalf of his defense. I believe that appropriate medical treatment, with antidepressant medication, could greatly improve his depression. Since he is not a Hunt inmate, he apparently cannot be seen and treated by the psychiatrist there, so arrangements must be made with the parish for mental health treatment. I strongly recommend that this be done as soon as possible. Should his condition continue to deteriorate, his competency may be brought into question.
Dr. Deland expressed a similar view when testifying at the hearing and corroborated Dr. Abrams's testimony that defendant did not appear to be malingering.[12] She found it "very significant" that defendant had a long history of treatment for mental illness and that he had two recent admissions for in-patient psychiatric care shortly before the murders. She noted that following the shootings, defendant received Paxil, an anti-depressant, and Risperdal, an anti-psychotic medication, while incarcerated at the Dixon Correctional Center. Dr. Deland believed that due to an oversight, defendant's medication had been discontinued when he was transferred to Charity Hospital for treatment of his paralysis and that as a result, there had been "a deterioration" in his mental health. She also noted that Dr. Suen, a psychiatrist at Dixon, had indicated in his evaluation that defendant had suffered from auditory hallucinations. Dr. Deland concluded,
It's my opinion that Mr. Miller is suffering from major depression, and that because of that, that he is compromising the Bennett[[13]] criteria, mainly in being able to assist counsel and in preparing his defense.[[14]]
Based on police reports she had reviewed, Dr. Deland also testified about the significance of defendant's conduct when apprehended following the shootings, including that which indicated that he was *918 conversing with a phantom entity he referred to as "Jason." She stated that the reports suggested that he suffered from "possible symptoms of mental illness" at the time of the shootings, but could not testify as to whether they met the legal definition of insanity without completing her evaluation. Finally, she reiterated her assessment that defendant's mental health had deteriorated as a result of his detention in solitary confinement and the withdrawal of anti-depressant medications.
On cross, Dr. Deland admitted that there existed no reports that defendant had experienced auditory or visual hallucinations before the shootings. She also stated that she did not observe defendant display psychotic symptoms either in court or when she assessed him at the hospital. The doctor further acknowledged that although defendant reported hallucinations, no documentation from Hunt revealed that any employees of the correctional facility observed him experiencing such incidents.
Next, the defense called Sergeant Aaron Hebert, who was among the officers who apprehended defendant following the shootings. Hebert stated that during the one and one-half hours that he negotiated defendant's surrender, defendant alternated between pointing his gun at his (defendant's) head and chest. When the negotiations commenced, defendant spoke of an individual named "Jason" who defendant maintained was in the room with him.[15]
On cross, Hebert testified that approximately two and one-half hours elapsed between the shootings and the time officers located defendant hiding in the shed. While officers were located outside the shed looking for defendant and well within earshot, they did not hear him conversing with Jason. Rather, the "conversation" commenced only after defendant had been discovered by police. Hebert also testified that during the negotiation for defendant's surrender, defendant gave responsive answers to the officers' questions and appeared to understand and comprehend the situation.
The defense proffered the statement of Sergeant David Shackleford, another officer present during the negotiation of defendant's surrender. Shackleford discussed his observation of defendant relating to his conversation with Jason to the officers. Finally, the defense proffered statements of other witnesses to the shootings, which described defendant as "out of his head" and as a "deranged mad man."
On rebuttal, the State called Michelle Gaudin, a nurse at the Ascension Parish prison, whose duty was to interview inmates and verify their complaints. She first encountered defendant when he was incarcerated at the prison during the fall months of 1998 and testified that he did not report hearing voices, nor did he appear delusional. On May 5, 2000, Gaudin visited defendant at the Hunt Correctional Institute at the request of the Ascension Parish Sheriff's Office to assess whether he exhibited signs or symptoms of mental illness. In response to her inquiry about depression, defendant told her "that he was not depressed at that time, that when he first got there he was depressed, but he was fine now." During her discussion with *919 defendant, she noted that he was able to catheterize himself, move himself from his bed to his wheelchair, attend to his personal hygiene and read. Given these observations and that defendant was an "active participant" in their conversation, Gaudin concluded that he did not display symptoms of depression that warranted further evaluation. Nonetheless, she agreed that her training as a nurse did not qualify her to make diagnoses of depression or other mental illnesses.
After entertaining argument on the issues of both the appointment of a sanity commission to determine defendant's capacity to proceed and his sanity at the time of the offense, the court denied defendant's motion to change his plea, ruling:
The Court finds that there was no evidence presented to this Court to indicate that the defendant did not know the difference between right and wrong at the time of the offense. And that's the crucial point that the Court's decision is based upon, whether he knew the difference between right and wrong at the time of the offense. There was no evidence presented to this Court by any expert that was called that would give me any indication that he did not know the difference between right and wrong.
Therefore, because there has been no showing, or good cause shown to this Court for a change, the motion is denied.

DISCUSSION
On appeal, defendant argues that the trial court's refusal to allow him to change his plea to not guilty by reason of insanity violated state law and deprived him of due process of the law. We agree that the trial court's denial of defendant's motion to amend his plea of not guilty to not guilty and not guilty by reason of insanity was reversible error. Consequently, the sole issue we will evaluate is whether the trial court abused its discretion in applying LSA-C.Cr.P. art. 561, resulting in legal error.
Relevant to our determination is the statutory enactment, LSA-C.Cr.P. art. 561, which provides:
The defendant may withdraw a plea of "not guilty" and enter a plea of "not guilty and not guilty by reason of insanity," within ten days after arraignment. Thereafter, the court may, for good cause shown, allow such a change of plea at any time before the commencement of the trial.
Before an analysis of this provision is made, it is appropriate to consider aspects of the insanity defense. Pursuant to LSA-C.Cr.P. art. 552, not guilty and not guilty by reason of insanity is one of the pleas an accused is expressly authorized to make.[16] *920 The right to plead not guilty by reason of insanity "has its roots in ancient Judaic, Christian, and Roman Law." Neely v. Newton, 149 F.3d 1074, 1079 (10th Cir. 1998), cert. denied, 525 U.S. 1107, 119 S.Ct. 877, 142 L.Ed.2d 777 (1999). "As early as the sixth century B.C., commentary on the Hebrew scriptures distinguished between the harmful acts traceable to fault and those that occur without fault." AMERICAN BAR ASSOCIATION, CRIMINAL JUSTICE MENTAL HEALTH STANDARDS 324 n. 8 (1989). The latter type of act, according to ancient scholars, was one committed by a young child, who was seen as incapable of weighing the moral implications of personal behavior, even when that behavior was willful. Mentally retarded and insane persons were likened to children. Id. Insanity's exculpatory effect was "firmly established by the time the United States Constitution was adopted, and . . . has remained a fundamental part of American criminal law since Revolutionary days." RUDOLPH JOSEPH GERBER, THE INSANITY DEFENSE 83 (1984). In 1843, the English House of Lords articulated the ancient defense in M'Naghten's Case, 10 Cl. & Fin. 200, 210, 8 Eng. Rep. 718, 722 (1843). Reflecting vestiges of the M'Naghten rule, Louisiana recognizes the insanity defense in LSA-R.S. 14:14, as follows:
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
The dual plea of "not guilty and not guilty by reason of insanity" serves to put the court and the prosecutor on notice of the defendant's intention to rely on the defense of insanity at the time of the offense. Pursuant to LSA-C.Cr.P. art. 561, if a defendant has initially pled not guilty, a defendant may withdraw that plea and enter a plea of not guilty and not guilty by reason of insanity. According to Article 561, if the change of plea is made within ten days of the original plea, the defendant's right to change his plea is unconditional; thereafter, "the court may, for good cause shown,[[17]] allow such a change of plea at any time before the commencement of the trial." (Emphasis supplied.)
*921 Article 561 is consistent with the procedure adopted in most modern insanity statutes and consistent with the analogous notice provision of Section 4.03(2) of the A.L.I. Model Penal Code (Tent. Draft No. 4, 1955). See LSA-C.Cr.P. art. 561, Official Revision Comment  1966. The post-arraignment, ten-day grace period provided by this article is in recognition of the fact that counsel at the arraignment, whether secured by the defendant or appointed by the court, frequently enters a plea of "not guilty" without having had a full opportunity to assess the advisability of urging a defense of insanity. Id. Added protection against inadvertent loss of a viable insanity defense is contained in the provision that authorizes the court, for good cause shown, to allow a change of plea at any time before the commencement of the trial. The provision of Article 561 for filing the insanity plea with leave of court "affords the defendant a fair and complete opportunity to urge the defense of insanity, and also precludes a belated urging of the plea as a dilatory tactic." Id.[18] Thus, the Official Revision Comment to Article 561 indicates that the statute is a limitation on the defendant's right to amend his plea upon the expiration of the ten-day period following his initial plea, primarily directed toward preventing the defense from changing the plea as a dilatory tactic.
As indicated, LSA-C.Cr.P. art. 561 allows a defendant to change his plea for "good cause shown." Louisiana legislation is replete with the term "good cause."[19] Courts have rejected arguments that this term renders a statutory provision vague. See Bailey v. Parish of Caddo, 30,822, p. 11 (La.App. 2 Cir. 8/19/98) 716 So.2d 523, 530, citing Wray v. Folsom, 166 F.Supp. 390 (W.D.Ark.1958) (There is no deficiency for failure to define "good cause"; it is a relative and highly abstract term with a meaning fixed by the verbal context as well as the actions and procedures involved.).
Turning to the jurisprudence evaluating Article 561, we note that in State v. Taylor, 254 La. 1051, 229 So.2d 95 (1970), which was also a capital case,[20] this court reversed defendant's conviction when finding trial court error in denying the motion to change plea filed on the day of trial. This court found the existence of good cause warranting the change in plea based on the opinion of a coroner that defendant was schizophrenic. The coroner had some psychiatric training, but was not a psychiatrist. *922 Further, there was factual testimony from the sheriff reporting the incarcerated defendant's mumbling and "talking to God." Id., 254 La. at 1058-1060, 229 So.2d at 97-98. This court reversed the conviction despite the fact the trial court had earlier found defendant competent to stand trial based on a report provided by three psychiatrists. Id.
Similarly, in State v. Delpit, 341 So.2d 876 (La.1977), this court reversed the defendant's armed robbery conviction because the trial judge denied defendant's motion to change his plea filed on the day of the trial. In support of the motion, defense counsel filed documents revealing defendant was functioning at the lower end of a borderline mental retardation range. Also introduced in support of the motion was an affidavit from the defendant's mother indicating he had been a problem since he was a small child, did not seem to understand right from wrong, and had attended a psychiatric clinic as a small child. Id., 341 So.2d at 877-878. This court also noted defense counsel's assertion that defendant was currently undergoing psychiatric treatment and that counsel had requested a report which he had not yet received. Id., 341 So.2d at 878.
Notably, in neither Taylor nor Delpit[21] did this court suggest that the defense was required to make a threshold demonstration that the defendant's history of mental illness manifested itself at the time of the offense in order for the trial court to grant the motion to change the plea to include not guilty by reason of insanity.
Following this court's earlier pronouncements concerning what constituted good cause within Article 561, Judge Charles A. Marvin cogently and correctly stated in State v. Mercer, 564 So.2d 783, 785-786 (La.App. 2 Cir.1990):
Defendant's evidence on a motion for a change of plea need not preponderate so as to establish the insanity defense, but must suggest some evidentiary basis for the plea. Good cause is simply an indication of some evidentiary basis for the insanity plea and is something less than a preponderance of the evidence.
. . . .
At the hearing of a motion for a change of plea the issue is not whether defendant can prove the insanity defense by a preponderance of the evidence at the trial. C.Cr.P. Art. 652. Where the "indicia" of an evidentiary basis, or good cause, for the change of plea is lacking, . . . the trial court does not abuse its discretion in denying the motion for the change. Where the "indicia" is greater, however, a trial court may be found to have abused its discretion by denying the motion for a change of plea.
In Mercer, defendant requested leave of court to amend his plea less than 30 days after arraignment and 40 days prior to the scheduled trial date. The appellate court found the trial court abused its discretion and reversed the denial of defendant's motion. The appellate court specifically noted there was no suggestion that defendant's motion for a change of plea was dilatory or frivolous.
In concluding that the defendant need only produce an indicia of insanity, or some evidentiary basis for the plea, to satisfy the good cause requirement, we note Article 561 does not specify a burden *923 of proof. This fact is contrasted with LSA-C.Cr.P. art. 652, which, at trial, imposes on the defendant "the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence." Given this statutory scheme, it would be incongruent to require the defendant to prove his insanity by a preponderance of evidence in order to merely change his plea.
Although an indicia of insanity at the time of the offense may be a relevant consideration, such cannot be the sole determinative factor in deciding whether a defendant may change his plea pursuant to Article 561. The language of Article 561 does not obligate the defendant to prove his insanity at the time of the offense to change his plea. Further, the defense of insanity at the time of the offense is ultimately an affirmative defense which must be decided by the factfinder at trial. LSA-C.Cr.P. art. 652.
Article 561 was never intended to prevent the defendant from changing his plea where a non-frivolous insanity defense exists. Rather, the intent of the article, and as it has been consistently applied for almost forty years, was to prevent the defendant from filing a last minute change of plea so as to gain a strategical and tactical advantage. A defendant's burden of showing good cause for a change of plea logically increases each day that his trial date nears. See State v. George, 262 La. 409, 263 So.2d 339, 340-341 (1972), vacated on other grounds, 411 U.S. 902, 93 S.Ct. 1532, 36 L.Ed.2d 192 (1973).
In sum, "good cause" of Article 561 is shown when the defendant produces an indicia of insanity and shows the plea is not changed as a dilatory tactic to achieve a strategic advantage. Conversely, a defendant who is possessed of no evidence whatsoever of mental illness would not be able to show good cause as required by Article 561. See State v. Sampson, 480 So.2d 952, 954 (La.App. 2 Cir.1985) (The "indicia" of an evidentiary basis for the change of plea, or "good cause," is not shown simply by the testimony of an assistant jailer that defendant was verbally abusive toward another jail inmate.); State v. Baldwin, 388 So.2d 664, 670 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981) (Good cause is not shown simply by a defendant's testimony that he was a "heavy drinker."); State v. Hurst, 99-2868 (La.App. 1 Cir. 10/3/00), 797 So.2d 75, 81, writ denied, XXXX-XXXX (La.10/5/01), 798 So.2d 962 (On motion to reconsider sentence, defense counsel conceded the motion for change of plea was a strategy to get evidence of the defendant's diminished capacity before the jury.).
After evaluating the statutory language of Article 561, the Official Revision Comment thereto, and the jurisprudence, we consider the facts before us. In defendant's case, the initial motion to change the plea was filed on August 23, 1999, some three months after the arraignment and ten months before trial. The second motion urging the change in plea was filed on May 12, 2000, one month before trial. The State did not argue it was not prepared to counter an insanity defense, but instead argued the defense had not offered sufficient evidence to warrant the change in plea.[22]
The evidence presented by the defense at the two hearings met the good cause threshold, thus requiring the trial court to allow the change in plea. Importantly, no argument was presented by the State *924 suggesting that defendant filed the motion to change plea for dilatory reasons. In fact, much of the documentation supporting the change in plea was provided by the State to the defense in discovery. Considering the district attorney's thorough cross-examination of the defense experts at the hearing, the State would not have required a continuance to counter an insanity defense.
In disregarding the evidence of mental illness either before or after the offense, the trial court created an additional requirement not provided by Article 561, that all evidence presented as good cause be immediately related to the defendant's mental health at the time of the offense. The statute neither recites within its language nor implicitly establishes any such burden of proof to be imposed on the defendant. The learned trial judge fell into error in making proof of insanity at the time of the offense the sole determinative factor in deciding whether the defendant could change his plea.
Logically, if a defendant can change a plea to take advantage of the insanity defense with no showing whatsoever for ten days after arraignment, the good cause requirement cannot be related to actual proof of the defense, but is related, instead, to prevention of abusive dilatory tactics. Nevertheless, in denying Miller's motion to amend the plea, the trial court questioned the relevance of the evidence of mental health problems prior to the crime or not immediately related to the crime itself. At the November 10, 1999 hearing, the court agreed with the prosecutor that defendant's "behavioral problems . . . in 1986 have no consequence to what actions he did in 1999 in killing his wife and murdering his child and his mother-in-law and another innocent bystander in the church." From the trial court's multiple comments that the defense failed to produce any evidence to support a change in plea, it appears that the court simply refused to consider any evidence that it did not see as immediately related to Miller's mental state at the moment of the crime.
In the instant case, by focusing on the defense's failure to present testimonial evidence demonstrating that defendant was suffering from a psychotic episode at the time of the shootings and apparently dismissing the significance of defendant's documented history of mental health treatment, the trial court usurped the jury's role to decide the ultimate merits of the insanity defense. See State v. Claibon, 395 So.2d 770 (La.1981) ("The determination of sanity is a factual matter reserved to the . . . fact finder."); State v. Lange, 168 La. 958, 965, 123 So. 639, 642 (1929) ("[T]he accused has the constitutional right to have his defense of insanity tried by jury.")
Trials in death cases differ in a number of ways from other criminal trials. In a death case, the jury not only decides guilt, but also determines what punishment should be imposed. Louisiana Constitution Article I, Section 17 provides that a "criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict." Thus, when a plea of not guilty by reason of insanity is urged in a death case, the jury is called upon to decide whether the defendant is not guilty by reason of insanity. If the jury accepts the insanity defense, then the death penalty cannot be imposed.
As a consequence of the court's denial of defendant's motion to change his plea, defendant proceeded to trial barred from presenting any evidence of his history of mental illness. The defendant acknowledged in his brief that "where the deaths of four victims occurred before numerous witnesses, including an entire church congregation, *925 the question before the jury was not who committed these crimes." Absent the defense of not guilty by reason of insanity, defendant was left essentially defenseless in the trial which would determine, not only his guilt, but upon conviction, whether he would be sentenced to death, a penalty "unique in its severity and irrevocability." Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976). Our review of the record reveals defendant presented sufficient evidence on his motion to amend his plea to satisfy the requirement of good cause shown.

CONCLUSION
Defendant's presentation to the trial court included evidence of almost lifelong mental problems for which defendant received intermittent treatment from the age of nine. Defendant's evidence exceeds the quantity of evidence submitted in Taylor and Delpit. In both of those cases, this court reversed the defendants' convictions based on the trial judge's refusal to allow the change in plea despite the fact those defense motions did not occur until the day of trial. Given the absence of any suggestion that the motion to change plea had been filed for dilatory purposes in this case and that the State made no argument that it would suffer resulting prejudice by the change in plea, and given the defendant showed an indicia of insanity, the good cause requirement was satisfied. "`[A]n essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence' that is essential to the accused's defense." Montana v. Egelhoff, 518 U.S. 37, 64, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (O'Connor J, dissenting), quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986).
The challenges we face in reversing defendant's conviction and sentence and remanding this matter for a new trial mirror those in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). We find observations of the Supreme Court pertinent here. As organ for the court, Justice Stewart observed: "The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child. But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all." Brewer, 430 U.S. at 406, 97 S.Ct. at 1243. In a concurring opinion, Justice Stevens explained: "Nothing that we write, no matter how well reasoned or forcefully expressed, can bring back the victim of this tragedy or undo the consequences. . . . The emotional aspects of the case make it difficult to decide dispassionately, but do not qualify our obligation to apply the law with an eye to the future as well as with concern for the result in the particular case before us." Brewer, 430 U.S. at 415, 97 S.Ct. at 1247.
Finding the pre-trial rulings of the trial court denied defendant his constitutional right to have the jury decide whether he was not guilty by reason of insanity, we reverse the conviction and sentence and remand this matter for a new trial.
CONVICTION AND SENTENCE REVERSED; CASE REMANDED.
JOHNSON, J., concurs in result.
NOTES
[1] Louisiana Revised Statutes 14:30 provides, in pertinent part:

A. First degree murder is the killing of a human being:
. . . .
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
. . . .
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.
. . . .
C. Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the determination of the jury.
[2] An alternate spelling in the indictment is "Vaniaro."
[3] In a somewhat related claim, defendant argues the court erred when it compelled him to stand trial without empaneling a sanity commission to conduct a meaningful inquiry into his competency to proceed.

The two inquiries are entirely separate. The issue of insanity relates to the defendant's inability to distinguish right from wrong at the time he committed the offense and should be considered by the factfinder at trial. LSA-R.S. 14:14; LSA-C.Cr.P. art. 650, et seq. In contrast, the question of competency addresses whether the defendant has "the capacity to understand the proceedings against him [and] assist in his defense" and is an issue for the court to resolve before trial. LSA-C.Cr.P. arts. 641 and 647.
[4] The record is unclear whether Carter formally adopted the defendant. She nevertheless assumed the role of his mother.
[5] Defense counsel then proffered the witness's report concerning defendant's history of mental illness.
[6] Separation Anxiety Disorder is "characterized by developmentally inappropriate and excessive anxiety concerning separation from home or from those to whom the child is attached." AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 40-41 (4th ed., Text Revision, 2000) (hereinafter DSM-IV-TR).
[7] Sleep Terror Disorder "is the repeated occurrence of . . . abrupt awakenings from sleep usually beginning with a panicky scream or cry." DSM-IV-TR at 634.
[8] One definition of "static encephalopathy" is:

Permanent or unchanging brain damage. The effects on development depend on the part of the brain involved and on the severity of the damage. Developmental problems may include any of a range of disabilities such as cerebral palsy, learning disabilities, mental retardation, autisum, PDD, speech delays, attention deficits, hearing & vision impairments, oral motor problems, etc.
http://www.come-over.to/fasstar/static.htm
[9] The Axis system is described as "involv[ing] an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome. Axis I includes "Clinical Disorders/Other Conditions That May Be a Focus of Clinical Attention." Axis II includes "Personality Disorders [and] Mental Retardation." Axis III includes "General Medical Conditions." Axis IV measures "Psychosocial and Environmental Problems," while Axis V provides a "Global Assessment of Functioning." DSM-IV-TR at 27.
[10] In Percy's testimony, she stated that defendant had consumed "fifty or so extra-strength Tylenol, Excedrin." However, the medical records from the Riverview Medical Center relating to the incident indicate that he ingested fifty aspirin.
[11] In response to the State's inquiry, Dr. Abrams stated unequivocally that he could not address defendant's sanity at the time of the offense.
[12] Dr. Deland described her impression of defendant:

Mr. Miller did not report symptoms that I did not see him having. He didn't report any excessive symptoms. He didn't try to go out of his way to show me that he was mentally ill, which is generally what people that attempt to malinger do.
When he did answer, the things that he did answer that I could verify by documentation, he did. So, the answers that he gave me were consistent with the documentation that I had.
So, I did not see any evidence of malingering. It was just more that he really couldn't care less about what happens to him at this point, which of course makes it virtually impossible for me to do my job.
[13] State v. Bennett, 345 So.2d 1129, 1138 (La.1977).
[14] Dr. Deland explained in more detail:

I would agree with Dr. Abrams, that I don't believe that he can sit through a trial and listen to everybody's testimony and keep track of it, and tell people when there's misstatements or mistakes. I don't believe that he can get on the stand and testify and be cross examined, because of his problems with concentration and attention and focus.
[15] Hebert testified:

When I first took over the negotiations, he referenced Jason. That may have continued for several minutes. I would go as far as maybe 10 or 15, and we never discussed Jason past that point.
. . . .
[Defendant] made reference to [Jason] being in the room. I asked about him. I asked where he was. He told me [he] was right here in front of me. After that, I took the conversation away from that direction and he never went back to it.
[16] The historical development of the plea is explained in LSA-C.Cr.P. art. 552, Official Revision Comment  1966:

(c) The defense of insanity at the time of the crime is handled in accordance with existing Louisiana procedures. The development and history of those procedures serve to explain their nature and effect. Art. 267 of the 1928 Code, as originally adopted, required that the defense of insanity "shall be filed, tried, and disposed of prior to any trial of the plea of not guilty, and no evidence of insanity shall be admissible upon the trial of the plea of not guilty." That procedure contemplated separate trials and virtually required the impaneling of two juries. The first jury would determine the insanity plea, and if the defendant was found sane, a second jury would be impaneled to determine whether he had committed the crime charged. It created a serious practical problem in the smaller country parishes where jury venires were barely adequate to provide even one twelve-man jury for a sensational murder or rape case. In an effort to eliminate the necessity of dual juries, a 1932 statute deleted the requirement of former Art. 267 that the insanity plea be tried and disposed of prior to the plea of "not guilty." However, no change was made in former Art. 261, which listed insanity as a special plea, and the amendatory statute provided no substitute for the procedure eliminated; it did not specify when the plea of insanity was to be raised or how it was to be handled. During the past twenty years the procedure has become rather well set by judicial decision, and the above Art. 552 conforms with that procedure. Under a plea of "not guilty," evidence of insanity at the time of the crime is inadmissible, for the defense of insanity must be specially pleaded. State v. Gunter, 208 La. 694, 23 So.2d 305 (1945). Under the dual plea of "not guilty and not guilty by reason of insanity" the insanity defense is not to be separately presented or tried, and all defenses may be urged. Evidence is admissible to show that the defendant did not commit the act, that he was justified by self-defense, that he was not responsible by reason of insanity, and other possible defenses on the merits. State v. Dowdy, 217 La. 773, 47 So.2d 496 (1950).
[17] No such standard was expressed in earlier legislation dealing with amendment of a plea. This court noted in State v. Dawson, 186 La. 900, 902-903, 173 So. 524, 524-525 (1937), that former Article 265 of the Code of Criminal Procedure allowed a defendant "at any time, with the consent of the court, [to] withdraw his plea of not guilty and then set up some other plea or demur or move to quash the indictment." This court observed the article left it to the sound discretion of the trial judge to permit the withdrawal of the plea, and the court's exercise of such discretion should not be disturbed unless it was unreasonable or arbitrary. As the motion to quash the indictment in Dawson illustrated, Article 265 was not limited to an amendment to plead not guilty by reason of insanity.
[18] See also State v. Taylor, 254 La. 1051, 1060, 229 So.2d 95, 98 (1970) (Article 561 was enacted to obviate the practice of dilatory tactics by defendants in criminal cases.); State v. Clark, 305 So.2d 457, 463 (La.1974) (on reh'g) (The purpose of the statutory time limits was to give the prosecution adequate notice of a defendant's intention to advance an insanity defense and adequate time to prepare in the face of such a defense.); State v. Mercer, 564 So.2d 783, 785 (La.App. 2 Cir. 1990) (When the defendant moved to change his plea 40 days before the scheduled trial date, there existed no suggestion that the motion was dilatory.)
[19] A computer search reveals the term "good cause" is used in 446 Louisiana code articles, statutes, and court rules. Black's Law Dictionary, 213 (7th ed.1999), defines "good cause" as a "legally sufficient reason."
[20] In Taylor, this court also noted that "appellant was on trial for his life and, this alone . . . might have been sufficient to warrant relaxation of strict adherence to the procedural rule provided by Article 561 which . . . was enacted to obviate the practice of dilatory tactics by defendants in criminal cases." Taylor, 254 La. at 1059-1060, 229 So.2d at 98. Under those circumstances and with "the absence of any contention by the State that the request for a change of plea was merely a delaying tactic," this court found the trial judge's ruling preventing the change of plea "unreasonable." Id., 254 La. at 1061, 229 So.2d at 98.
[21] In citing Taylor and Delpit, we in no way sanction or endorse filing a change of plea on the day of trial. Currently, with advances in mental health evaluation and testing, substantially more evidence is generally available on mental health issues than indicated in Taylor and Delpit. The closer in time to trial the change in plea is filed, the greater the risk good cause will not be shown.
[22] The gist of the State's argument in opposition to the motion was that there existed "no evidence" to suggest that defendant did not know right from wrong and that the defense was merely introducing "mitigation evidence as their support for an insanity defense."